IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CASE NO. 5:08-CR-24-CAR-CWH |
| | : | |
| PYROTECHNIC SPECIALTIES, INC.; | : | |
| DAVID J. KARLSON; | : | |
| F. BRAD SWANN; | : | |
| DANIEL RAMONE; and | : | |
| GLEN CUNDIFF; | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS BASED UPON OUTRAGEOUS GOVERNMENTAL MISCONDUCT AND/OR MOTION *IN LIMINE* AND FOR RELEASE OF GRAND JURY TRANSCRIPTS

COME NOW, Pyrotechnic Specialties, Inc., David J. Karlson, F. Brad Swann and Daniel Ramon, Defendants herein, and file this, Defendants' Brief in Support of Defendants' Joint Motion to Dismiss Based Upon Outrageous Governmental Misconduct and/or Motion *in Limine* and for Release of Grand Jury Transcripts, and respectfully show this Court the following:

## I. SUMMARY OF ADDITIONAL GOVERNMENTAL MISCONDUCT

The government's Second Superseding Indictment against the Defendants asserts that the Defendants allegedly engaged in a conspiracy to:

> [S]ell, transfer, treat, store prior to disposition, and otherwise dispose of pyrotechnic devices that had been manufactured by Pyrotechnic Specialties, Inc., which were unacceptable to the United States, its departments and agencies, including diversionary charges, many of said charges not meeting acceptance standards as set forth in the contract specifications.

Docket # 196, p. 3. The Defendants have come into possession of evidence which demonstrates that numerous, critical allegations in the government's Indictment are false, demanding dismissal

1

of the Indictment. At minimum, the Defendants respectfully request that this Court hold a full evidentiary hearing regarding the matters set forth herein, and that this Court exclude any and all evidence relating to the Solicitation/Contract/Order for Commercial Items ("Solicitation/Contract/Order"), dated September 25, 2001, from any trial of this matter.

Specifically, the government's Indictment alleges that, from 1996 through 2007, the United States Navy awarded three (3) contracts, numbered N00164-96-D-004, N00164-98-D-0049 and N00164-02-D-0005, to PSI for production of diversionary charges. *Id*. at 4.

> To meet orders **from the United States Navy**, Pyrotechnic Specialties, Inc., would produce MK141 diversionary charges in lots of 8,050 units. Fifty (50) units were designated for lot acceptance testing. The testing requirements **were specified in the contracts**. **The United States Navy** accepted the lot only if there were zero defects."

*Id*. at 4 (emphasis added). However, the Indictment also concedes that the Navy granted waivers of deviation to accept diversionary charges which failed lot acceptance testing. *Id*. at 5.

## A. The Government's False "FBI Contract" Allegations

The government alleges in its Indictment that the Federal Bureau of Investigation ("FBI") procured diversionary charges to be used by the FBI's Special Weapons and Tactics ("SWAT") teams and Hostage Rescue Team. *Id*. at 7. Specifically, the government alleges that:

> [O]n or about September 25, 2001, Pyrotechnics Specialties, Inc. and the Federal Bureau of Investigation entered into **a fixed price contract**, numbered J-FBI-01-079, for the procurement of MK 141 Mod 0 diversionary charges. Said diversionary charges were to be manufactured in accordance with the specifications of the United States Navy, an agency of the Department of Defense. The **initial purchase** was for approximately 10,200 units, at a cost of $316,000.

Docket # 196, p. 7 (emphasis added). The Indictment continues to allege, as alleged overt acts of the purported conspiracy, purchases by the FBI from Pyrotechnic Specialties, Inc. ("PSI") of allegedly "defective or otherwise unacceptable MK 141 diversionary devices" on December 1,

2003; April 16, 2004; April 26, 2004; May 11, 2004; May 13, 2004; May 19, 2004; June 2, 2004; June 14, 2004; August 10, 2004; August 12, 2004; September 13, 2004; September 14, 2004; September 29, 2004 and October 13, 2004 (hereinafter collectively "2003 and 2004 FBI purchases"). *Id*. at 12, 14, 15. These alleged purchases by the FBI also form the basis for Count 2, alleged conspiracy to defraud the government with respect to claims in violation of 18 U.S.C. § 286; Counts 3 through 9, alleged false claims in violation of 18 U.S.C. § 286; and Count 10, mail fraud in violation of 18 U.S.C. § 1341. *See* Docket # 196, p. 17-20.

At the Pretrial Conference held by the Court on December 19, 2008, the transcript of which is attached as Exhibit A, counsel for the government stated as follows: "If it please the Court, Your Honor. We refer to the FBI contract **that controlled all invoice purchases**. Again, we have it in the courtroom here today." Exhibit A, p. 24 (emphasis added). Counsel for PSI promptly requested that counsel for the government provide PSI with a copy of the contract, and counsel for the government promised to provide it at the conclusion of the hearing. *Id*. Counsel for the government continued on to state that "[w]ith the FBI there is only one contract **but there were numerous purchase orders and invoices issued under that umbrella**." *Id*. at 25 (emphasis added).

Following the hearing, the government provided the Defendants with a copy of the alleged "FBI contract," the September 25, 2001, Solicitation/Contract/Order, attached as Exhibit B. In the Solicitation/Contract/Order, the FBI purchased "MK-141 M0D0 Diversionary Devices 10,200 each [i]n accordance with Navy and FBI Specifications on file." Exhibit B, p. 2. Critically, the Solicitation/Contract/Order expressly states: "2. TERM AND TYPE OF CONTRACT **The term of this contract shall be for a one-time purchase of items** as described

3

in the Description/Specification/Work Statement. **The type of contract shall be a Firm-Fixed Price contract**." *Id*. (emphasis added).[1] The Solicitation/Contract/Order expressly referenced the Federal Acquisition Regulations, 48 C.F.R. 16.100 *et seq*., which govern government contracts. *Id*. at 3.

The government has further provided the Purchase Orders for Supplies and Services ("Purchase Orders") by the FBI for the 2003 and 2004 FBI purchases, examples of which are attached hereto as Exhibit C. These Purchase Orders **do not** incorporate the 2001

---

[1] "'When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'" *Franconia Associates v. United States*, 536 U.S. 129, 141, 122 S.Ct. 1993 (2002) (quoting *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607, 120 S.Ct. 2423 (2000)).

The cardinal rule of contract law is that a court should strive to effectuate the intent of the parties. [Cit.]. **When a contract term is clear and unambiguous, the best evidence of this intent is the term itself, and a court may not give such term meaning beyond that clearly expressed in the four corners of the document**.

*Hibiscus Associates Ltd. v. Board of Trustees of Policemen and Firemen Retirement System of City of Detroit*, 50 F.3d 908, 919 (11th Cir. 1995) (emphasis added) (citing Hughes v. Professional Ins. Corp., 140 So.2d 340, 345 (Fla. 1st Dist.Ct.App.), cert. denied, 146 So.2d 377 (1962). Fecteau v. Southeast Bank, N.A., 585 So.2d 1005, 1007 (Fla. 4th Dist.Ct.App.1991)); *see also Ford Motor Credit Co. v. Ledbetter*, 582 F.2d 1012, 1015 n.10 (5th Cir. 1978) ("Under Georgia law, the parties to a contract must mutually consent to both its terms and to any subsequent change in those terms") (citing *Speigel v. Hays*, 103 Ga.App. 293, 119 S.E.2d 123 (1961). It is a "general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States." *United States v. Seckinger*, 397 U.S. 203, 210, 90 S.Ct. 880 (1970) (citing *Sternberger v. United States*, 401 F.2d 1012, 1021, 185 Ct.Cl. 528, 543 (1968); *Sun Shipbuilding & Drydock Co. v. United States*, 393 F.2d 807, 816, 183 Ct.Cl. 358, 372 (1968); *Jones v. United States*, 304 F.Supp. 94, 103 (S.D.N.Y.1969)). Moreover, any "third party beneficiary [to a contract] need not be specifically named in the contract, but the parties' intention to benefit the third party must be evident from the face of the contract." *AT&T Mobility, LLC v. National Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007) (citing *Northen v. Tobin*, 262 Ga.App. 339, 585 S.E.2d 681 (2003); *Plantation Pipe Line Co. v. 3-D Excavators, Inc.*, 160 Ga.App. 756, 287 S.E.2d 102 (1981)).

4

Solicitation/Contract/Order or any Navy specifications. In truth, the Purchase Orders contain **no alleged requirements or specifications for diversionary charges whatsoever**.

The government's allegations in the Indictment and its statements at the Pretrial Conference to the effect that the 2003 and 2004 FBI purchases were subject to alleged Navy or FBI specifications are therefore totally inaccurate and misleading. The government indicted this case in April of last year, and clearly knew that the 2003 and 2004 FBI purchases were not governed by any alleged specifications well before that time. It is clear that the government has attempted mischaracterize the 2001 Solicitation/Contract/Order as a sort of alleged "requirements contract," covering any and all subsequent orders of diversionary charges from PSI by the FBI. However, the Federal Acquisition Regulations, cited in the contract, expressly provide regarding requirements contracts, in relevant part:

> (a) Description. A requirements contract provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period, with deliveries or performance to be scheduled by placing orders with the contractor.
>> (1) For the information of offerors and contractors, **the contracting officer shall state a realistic estimated total quantity in the solicitation and resulting contract**…
>> (2) **The contract shall state, if feasible, the maximum limit of the contractor's obligation to deliver and the Government's obligation to order**. The contract may also specify maximum or minimum quantities that the Government may order under each individual order and the maximum that it may order during a specified period of time.
> (b) Application.
>> (1) A requirements contract may be appropriate for acquiring any supplies or services when the Government anticipates recurring requirements but cannot predetermine the precise quantities of supplies or services that designated Government activities will need during a definite period.

48 C.F.R. 16.503 (emphasis added). The 2001 FBI Solicitation/Contract/Order contains no reference to the FBI's future requirements but, on the contrary, expressly provides that it is a

one-time contract. Given the clear outrageous governmental misconduct by the government, this Court should dismiss this action against the Defendants, or in the alternative, Counts 1 through 10 of the government's Indictment. At minimum, the Court should exclude any and all evidence relating to the 2001 FBI Solicitation/Contract/Order and hold a full evidentiary hearing regarding governmental misconduct relating to the allege "FBI contract."

## B. The Government's FBI Injuries Allegations

The government has alleged in its Indictment that:

[O]n or about October 14, 2004, in the Philadelphia, Pennsylvania area, three (3) FBI special agents, who were members of a SWAT team, were required to assist during a kidnap[p]ing investigation. While on the scene, the agents carried MK141 diversionary charges in a pocket designed for charges on the outside of their tactical vests. One of the MK141 diversionary charges procured from Pyrotechnic Specialties, Inc., prematurely detonated while on the vest causing serious injuries to all three (3) agents, as well as damaging the interior of their government vehicle.

Docket # 196, p. 8. The FBI agents, Donald Bain, Thomas Scanzano, James Milligan and Nels Cooper Brannan, all gave sworn testimony before the grand jury, and have further filed civil lawsuits against PSI and Mr. Karlson relating to the alleged incident. *See Bain, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:06-cv-04429-BWK; *Bain, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:06-cv-04979-BWK; *Brannan, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:07-cv-04464-BWK; *Milligan, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:06-cv-04427-BWK; *Scanzano, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:06-cv-04428-BWK; *Scanzano, et al. v. Pyrotechnic Specialties, Inc., et al.*, civil action number 2:06-cv-04980-BWK; all in the United States District Court for the Eastern District of Pennsylvania. The Cable News Network ("CNN") has also aired two reports on PSI as a result of the Agents' injuries. Most recently, on

Monday, November 17, 2008, CNN broadcast a story entitled "Flash Bangs: Faulty Grenades? A CNN Special Investigation," in which the Agents blamed PSI for their injuries.

PSI and its President, Mr. David J. Karlson, have specifically and repeatedly requested any and all evidence relating to the alleged October 2004 incident since their initial discovery requests in April of last year, in particular any investigative reports of the incident by the FBI. *See* Docket # 42, 51, 141, 152.[2] At the December 19, 2008, Pretrial Conference, counsel for the government informed the Court and the parties that the government had no "mishap reports." Exhibit A, p. 42.

However, on December 31, 2008, counsel for Mr. Karlson and Mr. Daniel Ramon met with counsel for the government at counsel for the government's offices. During this meeting, counsel for the government provided counsel for Mr. Karlson and Mr. Ramon with a Report from the FBI Laboratory in Quantico, Virginia, attached as Exhibit D, dated January 13, 2005, regarding an examination of the diversionary charge involved in the October 2004 incident. *See* Exhibit D. The report provides as follows:

Results of Examination:

Metallurgical examinations were made of the Q1-Q3 blast debris and the K1-K5 exemplar diversionary devices. The examinations revealed that one of the lugs from the diversionary device represented by the debris in items Q1-Q3 fractured away from the device. However, a definite determination of the cause(s) of the fracture could not be made. **The physical evidence does indicate that the safety pin was not in place when the device functioned**. However, it is not known how the safety pin became dislodged…

Remarks:

The items listed above are being retained in the FBI Laboratory. **The final disposition will be addressed in a separate communication**.

---

[2] PSI and Mr. Karlson have further repeatedly requested to be permitted to inspect any and all remains of the diversionary charge involved in the alleged incident. *See* Docket # . To date, PSI and Mr. Karlson have not been given access to the remains.

*Id*. at 2 (emphasis added). The Report demonstrates that the October 2004 incident was **not** caused by any alleged action or omission by PSI or Mr. Karlson, and is therefore utterly irrelevant.

The Defendants adamantly believe that the October 2004 incident and the injuries to Agents Bain, Scanzano, Milligan and Brannan were the central, driving force behind the investigation of the Defendants and the initiation of this prosecution. The January 13, 2005, FBI Laboratory Report establishes that the Agents' injuries were not the result of any alleged wrongdoing by the Defendants, but were the result of another cause. Most egregiously, the FBI has been in possession of the Report for nearly four (4) years, and has been aware of the truth regarding the October 2004 incident while withholding the Report and permitting PSI and its officers and employees to be criminally indicted, as well as subjected to costly civil lawsuits and to false and defamatory coverage and allegations on national television, with devastating consequences for PSI's business and the Defendants' lives. The government's withholding of the Report constitutes extreme governmental misconduct warranting dismissal of the government's Indictment. At minimum, this Court should hold a full evidentiary hearing regarding the alleged October 2004 incident and the Report. The Court should further order the disclosure of all grand jury materials to the defense, in order to enable the defense to see what alleged representations regarding the asserted October 2004 incident were made, including any materials by the Case Agent in this case, FBI Special Agent Gregory McLendon.

**C. The Government's False "Gentleman's Club" Allegation**

The government's sole allegation in its Indictment against Mr. Glen D. Cundiff is as follows:

That Glen D. Cundiff accepted **a free visit to an adult entertainment establishment**, in Atlanta, Georgia, from David J. Karlson. Subsequently from on or about November 7,

2007, through November 9, 2007, Glen D. Cundiff sought to negotiate the acceptance of MK141 diversionary devices on behalf of Pyrotechnic Specialties, Inc. with the United States Marine Corps, a Department of the Navy.

Docket # 196, p. 13 (emphasis added). However, a U.S. Naval Criminal Investigative Service interview, attached as Exhibit E, dated March 30, 2006, states that "CUNDIFF said on one occasion he and John Stockinger went out to dinner in Atlanta with the PSI CEO Dave Karlson. Each paid separately. CUNDIFF indicated Karlson had a free pass to a Gentlemen's club and after dinner the three of them went there." Exhibit E, p. 2. However, Mr. Stockinger, a Naval Surface Warfare Center ("NSWC") employee, expressly told FBI investigators, as evidenced by an FBI Form FD-302, attached as Exhibit F, that "**STOCKINGER, CUNDIFF and KARLSON went to a Chinese restaurant and got free door tickets to enter the CHEETAH… Nobody bought anyone anything**." Exhibit F, p. 6 (emphasis added).

Accordingly, the government has been aware since the outset of this case that its allegations concerning Mr. Cundiff and his alleged "free" visit to a "gentleman's club" with Mr. Karlson in 1999—eight (8) years before he allegedly sought to negotiate for the purchase of diversionary charges, are deliberately and misleading false. The government's persistence in allowing this wholly specious allegation to remain charged against Mr. Cundiff and Mr. Karlson is outrageous in the extreme and further supports dismissal of the Indictment on grounds of outrageous governmental misconduct.

## D. The Government's False "Mixing" Allegation

The government further alleges in its Indictment:

That in order to implement their scheme and artifice to defraud and to secrete the shipment of unacceptable diversionary charges, the defendants would mix reworked MK141 diversionary charges with diversionary charges which had not been reworked in such a manner as to camouflage the defective devices from receiving personnel, and shipped mixed MK141 diversionary charges to the Federal Bureau of Investigation.

9

Docket # 196, p. 8 (emphasis added). Defense Contract Management Agency ("DCMA") Quality Assurance Supervisor ("QAS") Michael King testified before the grand jury that he inspected approximately 300 diversionary charges in the possession of the FBI in Quantico, Virginia, in March 2006, and that half of the charges had been reworked and the other half had not, and that the non-reworked charges were "mixed in" with the reworked charges.

It is important to note that charges which PSI had reworked were stamped on the top of the charges with an alpha ("A") designation. It is a critical element of the government's fraud theory that the diversionary charges from Lot 73 were allegedly falsely marked with the alpha designation allegedly reflecting that they had been reworked, when allegedly no reworking had taken place.

On December 29, 2009, PSI Vice President, Mr. Barry Lindsay, and counsel for PSI and Mr. Karlson traveled to Quantico where they inspected the diversionary charges which King had inspected in 2006, and further inspected over 200 more charges. Mr. Lindsay and counsel found that **none** of the charges—either the charges inspected by King or the charges inspected by Mr. Lindsay—had been reworked and **none** of the charges were stamped with an alpha designation indicating that they had been reworked, most probably the result of inadvertence or mistake on the part of PSI. In contrast, King swore to the grand jury that all the charges he examined at Quantico had been stamped with an alpha designation. Accordingly, the government's "mixing" and "camouflage" allegation is demonstrably false, and King's grand jury testimony was knowingly false. This additional false representation further urges dismissal of the government's Indictment against the Defendants.

## II. ARGUMENT AND CITATION OF AUTHORITIES

10

The government's repeated false and misleading allegations, both in its Indictment and before the grand jury, regarding (1) the nature of the "FBI contract" and the alleged "specifications" reputedly applicable to the 2003 and 2004 FBI purchases; (2) the alleged October 2004 incident involving the FBI agents; (3) Mr. Cundiff's and Mr. Karlson's alleged "free visit" to a gentleman's club and (4) alleged "mixing" of reworked and non-reworked MK141 diversionary charges, when taken together and with instances of governmental misconduct previously raised in this matter, authorizes this Court to dismiss the government's Indictment pursuant to the doctrine of outrageous governmental misconduct and the Court's supervisory powers.

**A.   Dismissal of Indictments for Outrageous Governmental Misconduct and Pursuant to the Court's Supervisory Power**

> Our Government is the potent, omnipresent Leader.  For good or for ill, it teaches the whole people by its example.  Crime is contagious.  If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law until himself; it invites anarchy.  To declare that in the administration of the criminal law the end justifies the means - to declare that the Government may commit crimes in order to secure the conviction of a private criminal - would bring terrible retribution.  Against that pernicious doctrine this Court should resolutely set its face.

*Olmstead v.United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting). In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637 (1973), the United States Supreme Court envisioned that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking the judicial processes to obtain a conviction," *id*. at 431-32. The doctrine of outrageous government conduct originated from this *dicta* in *Russell*. *See United States v. Santana*, 6 F.3d 1, 3 (1st Cir. 1993) ("Although it has a comfortably familiar ring, 'outrageous government misconduct' is surpassingly difficult to translate into a closely defined set of behavioral norms").

11

The answer is all the more difficult because due process is not a technical fixed concept. The Supreme Court has recognized that, regardless of any prejudice to a defendant at trial, an indictment could be subject to dismissal if it was the product of "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259, 108 S.Ct. 2369 (1988). Similarly, the Supreme Court has recognized that the government's investigatory conduct may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Hampton v. United States,* 425 U.S. 484, 491-98, 96 S.Ct. 1646 (1976) (Powell, J., concurring). In order to prevail under this theory, a defendant must show "that the challenged governmental conduct violated 'that fundamental fairness, shocking to the universal sense of justice.'" *United States v. Haimowitz*, 725 F. 2d 1561, 1577 (11th Cir. 1984) (quoting *Russell*, at 432). "Whether outrageous government conduct exists 'turns upon the totality of the circumstances with no single factor controlling.'" *Id*. at 1577 (citation omitted); *accord United States v. Martin*, 480 F.Supp. 880, 886 (S.D. Tex. 1979); *United States v. Phillips Petroleum Co.*, 435 F.Supp. 610, 622 (N.D.Okl. 1977); *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 580 (W.D. Tex. 1977).

Although the instances where dismissal is appropriate are rare, this is a case where dismissal is warranted or, at the very least, this Court should allow all discovery related to the government's misconduct as set forth below. "The continuing vitality and integrity of our 'government of laws' would be imperiled if we sanctioned the manufacturing of crime by those responsible for upholding and enforcing the law." *United States v. Lard,* 734 F.2d 1290, 1296

(8th Cir. 1984). The Eleventh Circuit has further recognized that a prosecutor possesses a "duty to refrain from improper methods calculated to produce a wrongful conviction." *United States v. Crutchfield, 26* F.3d 1098, 1103 (11th Cir. 1994) (citing *Eason,* 920 F.2d at 736 n. 8; quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629 (1935)). A district court "may exercise [its] discretionary power to dismiss an indictment on grounds of prosecutorial misconduct where a sufficient showing of prejudice has been made." *United States v. Accetturo*, 858 F.2d 679, 681 (11th Cir. 1988) (citing *United States v. Holloway,* 778 F.2d 653, 655 (11th Cir. 1985)). As one court noted, the government's misconduct cannot go unremedied. *See United States v. Omni International Corporation*, 634 F. Supp. 1414, 1439 (D.Ma. 1986) (using the Court's supervisory power to dismiss the indictment and "condemn[ing] the manner in which the Government proceeded," and recognizing that the court" cannot now stand idly by, implicitly joining the federal judiciary into such unbecoming conduct").

An additional source of the Court's authority over the government's conduct in this case is its supervisory power. An indictment is subject to dismissal under a court's supervisory powers if it was the product of "prosecutorial misconduct" which gives the court "'grave doubt' that the decision to indict was free from the substantial influence of" such misconduct. *Bank of Nova Scotia*, 487 U.S. at 252. In *United States v. Hastings*, 461 U.S. 499, 505, 103 S.Ct. 1974 (1983), the Supreme Court recognized that the supervisory powers of the federal judiciary could be invoked either "to implement a remedy for violation of recognized rights" or "as a remedy designed to deter illegal conduct." The use of the Court's supervisory powers is particularly appropriate where, as here, the government's misconduct has compromised "the integrity of the judicial process' and threatened "to impair the Court's role as an impartial adjudicator." *United*

*States v. Caputo*, 633 F.Supp. 1479, 1492 (E.D.Pa. 1986), *rev'd on other grounds sub nom United States v. Martino*, 825 F. 2d 754 (3d Cir. 1987); *see also United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1983);*United States v. Samango*, 607 F. 2d 877, 882 (9th Cir. 1979); *United States v. Basurto*, 497 F. 2d 781 (9th Cir. 1974); *United States v. Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973); *see generally Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692 (1988) ("[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them").

Other courts have held that dismissal was appropriate in similar or less egregious cases of governmental misconduct. *See United States v. Twigg, 588* F.2d 373, 382 (3d Cir. 1978) (reversing the defendant's convictions relating to manufacture and distribution of methamphetamine based on outrageous government misconduct where Drug Enforcement Administration agents caused an informant to set up a methamphetamine laboratory in partnership with a drug dealer and provided the chemicals to the informant, and the defendant was arrested carrying drugs for the enterprise in order to repay a debt); *Lard,* 734 F.2d at 1297 (reversing the defendant's conviction for transferring an unregistered firearm where uncover Bureau of Alcohol Tobacco and Firearms agents went to the defendant's home and asked him if he had any firearms to sell, and then requested that the defendant manufacture a pipe bomb); *United States v. Gardner,* 658 F.Supp. 1573, 1580 (W.D.Pa. 1987) (granting the defendant's motion to dismiss indictment for unlawful distribution of a controlled substance for alleged violation of his due process rights based on outrageous government conduct where an informant

14

for the United States Postal Inspectors kept badgering the defendant to provide him with cocaine, and the defendant finally obtained some cocaine for the informant as a go-between).

## B. <u>The Duty of the Prosecutor is to Do Justice</u>

A prosecutor's first obligation is not to convict, but to serve truth and justice, including ensuring the defendant's right to a fair trial. *See United States v. Leung*, 351 F.Supp. 2d 992, 998 (C.D. Cal. 2005). Fundamentally, "the prosecutor's obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public." ABA Standard 3-1.2, Commentary (App. C at 188-120).

As the Supreme Court observed long ago in a now-famous statement of a prosecutor's duty:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, *while he may strike hard blows, he is not at liberty to strike foul ones*. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger,* at 88 (emphasis added). In addition, as the Eleventh Circuit Court of Appeals has expressly held:

> A United States district attorney carries a double burden. He owes an obligation to the government, just as any attorney owes an obligation to his client, to conduct his case zealously. But he must remember also that he is the representative of a government dedicated to fairness and equal justice to all and, in this respect, he owes a heavy obligation to the accused. Such representation imposes an overriding obligation of fairness so important that Anglo-American criminal law rests on the foundation: better the guilty escape than the innocent suffer.

*United States v. Eason,* 920 F.2d 731, 735-36 (11th Cir. 1990).

15

**C. The Cumulative Weight of the Governmental Misconduct in this Case Urges Dismissal**

The government has deliberately or recklessly made various false allegations against the Defendants which support dismissal for outrageous governmental conduct, or pursuant to the Court's supervisory power. The government's mischaracterization of the scope Solicitation/Contract/Order in its Indictment and to the Court and the parties, its withholding of exculpatory evidence in the form of the FBI Laboratory Report and the false allegations regarding the alleged gentleman's club and mixing of diversionary charges are highly outrageous and have severely damaged the integrity of these proceedings and grossly infringed on the Defendants' due process rights. These violations are further exacerbated by the government's previous instances of misconduct in intentionally failing to disclose to PSI the fraud by its Safety and Environmental Manager, Dennis Slicer, against the company. The totality of this egregious and outrageous misconduct may be held to authorize dismissal of the charges against the Defendants for outrageous governmental misconduct. At very least, the defense requests that the Court hold an evidentiary hearing on the matters raised herein.

**D. In the Alternative This Court Should Exclude Any and All Evidence Relating to the Alleged "FBI Contract," and Order Disclosure of the Grand Jury Transcripts**

Defendants also request that the Court exclude any and all evidence relating to the alleged 2001 FBI Solicitation/Contract/Order from the trial of this matter. The government's alleged "FBI contract" has minimal relevance to the conduct charged against the Defendants in the Indictment pursuant to Federal Rules of Evidence 401 and 402. Any asserted relevance is moreover substantially outweighed by the potential of the alleged "FBI contract" to confuse the issues and mislead the jury, pursuant to Federal Rule of Evidence 403.

Finally, Defendants seek access to all grand jury transcripts, including all statements by the prosecutor and the FBI Case Agent. The evidence outlined above contains evidence of false statements by witnesses for the government before the grand jury, and the defense has reason to believe that similar statements were made by the prosecutor and/or case agent to persuade the grand jury to indict defendants. The Fifth Circuit addressed the subject of inaccurate advice by a prosecutor to a grand jury in *United States v. McKenzie,* 678 F.2d 629 (5th Cir. 1982). In *McKenzie,* a grand jury asked the prosecutor the significance of 10 - 10 tie in any vote to indict. The prosecutor implied that he did not know the answer, despite the fact that he had earlier informed the grand jury that any vote of less than twelve would result in a "no true bill." *Id.* at 633. The Fifth Circuit examined the grand jury transcripts and ruled that the prosecutor's answer was not only "error" but "highly objectionable." *Id.; see also United States v. Peralta,* 763 F. Supp. 14 (S.D.N.Y. 1991) (dismissing indictment, in part, because prosecutor misstated the law to the grand jury relating to the requirements of constructive possession); *United States v. Sousley,* 453 F. Supp. 754, 758 n. 1 (W.D.Mo. 1978) (in reversing conviction on double jeopardy grounds, the court criticized the prosecutor for inaccurately answering a question by the grand jury and recognized that "United States grand juries, persons subject to potential indictment, and the proper administration of criminal justice ... require that Assistant United States Attorneys conduct sufficient legal research to be in a position to give accurate answers to questions they may be asked by members of a grand jury").

Similarly, in *United States v. Twerksy,* 1994 WL 319367 (S.D.N.Y. June 29, 1994), the defendant moved to dismiss the indictment, arguing that the grand jury had been mis-instructed on the *mens rea* element of the money laundering charges. While recognizing that a prosecutor

17

need not give the grand jury legal instructions as comprehensive as those given to the petit jury, the court agreed to conduct an *in camera* review of the transcripts, reserving a decision on the merits of the motion to dismiss.

It is respectfully requested that this Court either adopt the approach taken by the district court in *Twerksy* or simply grant the Defendants' request for disclosure. Federal Rule of Criminal Procedure 6(e)(3)(C)(i) permits the disclosure of matters occurring before a grand jury "when so directed by a court preliminarily to or in connection with a judicial proceeding." Courts have granted limited disclosures under this subsection where the moving party has demonstrated a particularized need. *United States v. Sells Engineering Inc.,* 463 U.S. (1983); *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211 (1979); *Miller v. Wainwright,* 798 F.2d 426, 429 (11th Cir. 1986). To meet this standard, the moving party must show that: a) the material is needed to avoid a possible injustice in another judicial proceeding; b) the need for disclosure is greater than the need for continued secrecy, and (c) the request is structured to cover only material so needed. *Sells*, 463 U.S. at 443. Under the facts presented herein, disclosure is warranted.

In *Horizon of Hope Ministry v. Clark County, Ohio,* 115 F.R.D. 1 (S.D. Ohio 1986), the plaintiff filed a civil rights suit against Clark County, Ohio and its employees. The government moved for a protective order barring discovery, in part, on the grounds of grand jury secrecy. In ordering disclosure, the district court emphasized that the grand jury investigation involved the same subject matter as the civil rights lawsuit but was over by the time the suit was initiated. *Id.* at 3. Moreover, the court recognized that any remaining secrecy interests could be safeguarded through a protective order. *Id.* at 4; *see also United States v. Kilpatrick,* 570 F. Supp. 505, 518-19 (D. Colo. 1983); *United States v. Jacobson,* 691 F.2d 110, 116 (2d Cir. 1982). Moreover, the

18

Defendants seek to determine whether in returning the instant indictment, the grand jury *necessarily* found the essential elements of the crime sufficient to comply with the Presentment Clause of the Fifth Amendment.

For these reasons, disclosure is warranted under Rule 6(e)(3)(C)(ii). That Rule states in pertinent part: "(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made *** (ii) when permitted by the court at the request of the defendant, upon a showing that *grounds may exist for a motion to dismiss the indictment* because of matters occurring before the grand jury." (Emphasis added). Under the plain reading of the Rule, for disclosure to be warranted, a defendant need **not** prove that he is *already* entitled to dismissal of the indictment. Rather, he must only make out a prima facie case that such grounds "may" exist. *See* Advisory Committed Note to Rule 6 (stating that rule requires a "preliminary factual showing of serious misconduct"). The Defendants have made such a prima facie case.

In *United States v. Kilpatrick,* 570 F.Supp. 505, a grand jury investigation was conducted in Colorado by prosecutors from the Tax Division of the Department of Justice into alleged obstruction of justice by the defendant. The defendant's attorneys made accusations of prosecutorial misconduct before the grand jury, many of which were "disputed by the accused government counsel and agents" and others were characterized as "silly" by government counsel. *Id.* at 506, 510. After an evidentiary hearing was conducted, the court ordered that "the entire grand jury transcript dealing with this indictment be made available for study by defense counsel." *Id.* As safeguards, the court added the following conditions:

> Disclosure shall be made to counsel and only to counsel. Paralegal shall not be used as substitute lawyers, and only members of the bar shall examine the transcript. They shall hold secret matters they learn, and they shall discuss them with no one other than co-counsel, and, insofar as necessary to the preparation of their arguments, with their clients. Typists given direct or indirect information concerning the content of the

transcript shall [receive] ... a copy of a written order commanding that they hold secret any information learned by them as to what took place before the grand jury, and those receipted orders shall be filed with the clerk. During the time a transcript is being used to prepare arguments in this case, counsel shall be personally responsible for its secrecy, and when not in actual use, the transcript shall be placed in locked storage to which only counsel has access. When need for the transcripts no longer exist, all copies of it shall be returned to the United States Attorney to remain in his custody and control. All briefs disclosing grand jury testimony shall be sealed.

*Id*.at 519.

Counsel do not object to the imposition of safeguards, such as those imposed in *Kilpatrick*. Without an examination of the grand jury transcripts, the extent of the government's misconduct related to the instant investigation cannot be fully scrutinized. Disclosure is, therefore, appropriate

### III. <u>CONCLUSION</u>

For the reasons set forth herein, Defendants Pyrotechnic Specialties, Inc., David J. Karlson, F. Brad Swann and Daniel Ramon, herein, pray that Defendants' Joint Motion to Dismiss Based Upon Outrageous Governmental Misconduct and/or Motion *in Limine* and for Release of Grand Jury Transcripts be granted and that the government's Indictment against Defendants be dismissed. At minimum, Defendants request that the Court hold an evidentiary hearing on the matters set forth herein, exclude any and all evidence relating to the Federal Bureau of Investigation Solicitation/Contract/Order for Commercial Items, dated September 25, 2001, and that this Court grant their request to inspect the entirety of the grand jury transcript related to this investigation.

Respectfully submitted, this 5th day of January, 2009.

**s/Craig A. Gillen**
Craig A. Gillen, Esq.
Georgia Bar No. 294838
GILLEN WITHERS & LAKE, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305
Telephone:    (404) 842-9700
Facsimile:    (404) 842-9750
E-mail:        cgillen@gwllawfirm.com

Counsel for Mr. David J. Karlson

**/s/Thomas Withers**
Thomas A. Withers, Esq.
Georgia Bar No. 772250
GILLEN WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Fax:          (912) 233-6584
E-mail:       twithers@gwllawfirm.com

Counsel for Pyrotechnic Specialties, Inc.

**/s/O. Hale Almand, Jr.**
O. Hale Almand, Jr., Esq.
Georgia Bar No. 013400
LAW OFFICES OF ALMAND&WIGGINS
1922 Forsyth Street
P.O. Box 1605
Macon, Georgia 30305
Telephone: (478) 746-2237
Fax:          (478) 746-2434
E-mail:       ohale@halealmand.com

Counsel for Mr. F. Brad Swann

**/s/Richard A. Rice, Jr.**
Richard A. Rice, Jr., Esq.
Georgia Bar No. 603203
THE RICE LAW FIRM, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305
Telephone: (404) 835-0783
Fax:        (404) 842-9750
E-mail:     rrice@trlfirm.com

Counsel for Mr. Daniel Ramon