1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF GEORGIA

3               MACON DIVISION

4        _____

5

6   THE UNITED STATES OF AMERICA,    :
                                     : Case No. 5:08-cr-24
7   VS                               :
                                     :  January 9, 2009
8                                    :
    PYROTECHNIC SPECIALTIES, INC.    :  Macon, Georgia
9   ET AL            DEFENDANT.      :
    _____

10

11               PRETRIAL CONFERENCE

12      BEFORE THE HONORABLE C. ASHLEY ROYAL
           UNITED STATES DISTRICT JUDGE, PRESIDING
13
    APPEARANCES:
14
    FOR THE GOVERNMENT:          HARRY FOX, AUSA
15                               UNITED STATES ATTORNEY'S OFFICE
                                 P.O. BOX 1702
16                               MACON, GA 31202-1702

17                               RICHARD GLAZE
                                 61 FORSYTH STREET
18                               ATLANTA, GA 30303

19  FOR THE DEFENDANTS:
    PYROTECHNIC SPECIALTIES:     THOMAS AULL WITHERS
20                               8 EAST LIBERTY STREET
                                 SAVANNAH, GA 31401
21

22  DAVID KARLSON:               CRAIG A. GILLEN
                                 ANTHONY LAKE
23                               ONE SECURITIES CENTRE, SUITE 1050
                                 3490 PIEDMONT ROAD
24                               ATLANTA, GA 30305

25

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1   DANIEL RAMON:                RICHARD ANTHONY RICE, JR.
                                  3490 PIEDMONT ROAD, N.E.
 2                                SUITE 1050
                                  ATLANTA, GA 30305
 3
     F. BRAD SWANN:               O. HALE ALMAND
 4                                ALMAND & WIGGINS
                                  1922 FORSYTH STREET
 5                                P.O. BOX 1605
                                  MACON, GA 31202
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                          TAMMY W. FLETCHER  USCR
                                 P. O. BOX 539
24                          MACON, GA 31202-0539
                                (478-752-3497)
25
```

1              THE COURT:  Good morning.

2              ATTORNIES COLLECTIVELY:   Good morning.

3              THE COURT:   This case seems to be getting more rather

4      than less complicated, and it seems to be the Government's

5      fault.  I read your recent response, page three, where you talk

6      about all the things that you got wrong.

7              MR. FOX:   Yes, sir, Your Honor.

8              THE COURT:   And that leads me to wonder what else you

9      got wrong.  Not necessarily you, but the Government in general

10     about this case.  And I am becoming increasingly concerned about

11     what I read here.  Very specifically I'm concerned about the

12     proposition related to what you acknowledge in your response as

13     Brady material related to the FBI crime laboratory report and

14     why it was that that was not made available to the Defendants in

15     this case until December 31st or thereabouts?

16             MR. FOX:   Certainly, Your Honor.

17             THE COURT:   Do you have an explanation for that?

18             MR. FOX:   Certainly, Your Honor.  The Government did

19     not receive that.  I can call the agent who gave that to me and

20     he can explain how he received it.

21             THE COURT:   Was this obtained by you based on the

22     direction that I gave on December 19th that you needed to go

23     back and find out if there was more information as was requested

24     by the defense lawyers?

25             MR. FOX:   If it please the Court, Your Honor.  It's

1    my understanding -- and I have Agent McClendon here to testify

2    -- that when he went back to Quantico and asked to receive the

3    materials in question, at that point the lab report was found.

4    We gave it to defense counsel as soon as I received it.

5            THE COURT:   Then that leads to the next question.   If

6    there is this undiscovered report about this incident perhaps

7    there is an undiscovered report about the later incident.

8            MR. FOX:   I'm sorry, Your Honor, I'm not following,

9    on which later incident?

10            THE COURT:   Well, I mean, there was this grenade

11    going off that you said established scienter and then there was

12    the second incident that occurred later after the modification

13    was required.   I forgot who was involved in that.   Was that the

14    soldiers involved in that?

15            MR. FOX:   Yes, Your Honor.

16            THE COURT:   Well, do we have a report on that?

17            MR. FOX:   We have a mishap report, Your Honor, but

18    that was all.

19            THE COURT:   So there was no lab report?

20            MR. FOX:   No, Your Honor.

21            THE COURT:   No investigation?

22            MR. FOX:   None that we have.

23            THE COURT:   Well, has somebody gone back and looked

24    for it?

25            MR. FOX:   If it please the Court, Your Honor.   The

1    Government will not go forward with the individual explosions.

2         THE COURT:    That is not the point.   The point is that

3    we have found now something that I find to be very important in

4    this case.   And when something is found the Government goes back

5    and supersedes the indictment.   And I am wondering what else

6    there is out there that might be Brady material?

7         I want to hear -- We are going to talk about the

8    Defendant's brief in support of Defendant's joint motion to

9    dismiss.   And this basically relates to three propositions, the

10   contract, which I understand, according to the defense, was only

11   supposed to be for one year.   I think it was 2001.   And then the

12   subsequent purchase orders.   And then the mixing of the

13   diversionary charges and then the proposition related to the

14   Cheetah Three.   I want to make sure that I understand factually

15   what happened here.   As to the -- well, what is the defense's

16   position -- First have you had the opportunity to read the

17   Government's response on that?

18        MR. GILLEN:    Yes, Your Honor, I read it this morning.

19        THE COURT:    What is your response to that?   I think

20   the question was whether there was some indication on the

21   subsequent pay forms, order forms or whatever, that there was

22   actually a continuation of this contract that was entered into

23   on 2001.   And, of course, I don't know.   I haven't seen these.

24   I don't know what they look like.

25        MR. GILLEN:    Your Honor, if I may start off and defer

1     to my colleagues, if they choose to supplement my remarks.  But

2     the contract -- the Court may remember back on December 19th

3     when we were here before the Court.  The Government kept talking

4     about this FBI contract and that all of the purchases that were

5     sent to the FBI came under "that umbrella".  And that Mr.

6     Withers said, well, we would like to see the contract.  Again

7     here we are on December 19th, where is this contract you have

8     been talking about?  We took a break and wanted to see it and

9     were informed that we would get it after the hearing.  When we

10    saw it, Your Honor, it is clear on the face of it that it is a

11    one-time contract.  It says it is a one time only contract.  So

12    it is clear there.

13          So what happened is is that we then look at the

14    exhibit, which they had marked, which showed the following

15    purchases and those purchases didn't even have reference to the

16    contract number, which the Government had represented was the

17    FBI contract which covered all deliveries to the FBI.  What then

18    occurred was is that we kept asking the Government if we could

19    come to see the exhibits.  Because as soon as we got out of

20    Court we wanted to sit down and physically look at what they

21    were going to be marking as an exhibit and what we were going to

22    be discussing today.  Holiday plans for, not for the defense,

23    but for certain Government agents and out-of-town trips,

24    resulted in the first time that we could go in to see the

25    exhibits being the morning of December 31st.  And during that

1    session with counsel for the Government, you know, I said what

2    is your possible theory about this contract that you've

3    represented covers these FBI purchases.  And showed him, you

4    know, when it is either on the first or second page of the

5    contract.  I said, you can't possibly have a theory here?  What

6    is happening here?  I said, what is your theory?  He says, I'm

7    thinking about it.  So on December 19th the Government says,

8    they still hadn't formulated some theory.

9         We then go on to say, as it relates to the contract,

10   clearly under the face of the contract they could not go --

11   which is the centerpiece of their fraud theory.  So then they

12   just stared at us.  The next time that we heard a response to

13   that was we are going to supersede the indictment.  As to the

14   other issues regarding the mixing and matching, which is the

15   second centerpiece --

16            THE COURT:  Wait a minute.  Go ahead, respond to that

17   Harry.

18            MR. FOX:  May it please the --

19            MR. RICE:  Judge, if I may just point out a couple

20   things.

21            THE COURT:  Oh, okay, go ahead.

22            MR. RICE:  The Government contracting that, you may be

23   well aware of this -- There are Government contracts and they

24   are essentially terms of art.  There are specific type of

25   contracts that the Government enters into.

1          THE COURT:   Pull the mike a little bit closer to you,

2     please.

3          MR. RICE:   That the Government enters into.  Mr. Fox

4     had been representing -- even though we had requested many times

5     over the last ten months to see the contract, we didn't get it

6     until just recently -- And what he had represented was

7     essentially a continuing open market contract, where the

8     Government enters into a contract and they can continue to

9     purchase supplies under that contract going forward.

10          THE COURT:   That's what I thought it was.

11          MR. RICE:   That's what we had been led to believe.

12     If it is that type of contract, then the initial contract has

13     got to say so and there are other requirements in those

14     continuing purchase orders.  For instance, the subsequent

15     purchase order, you know, one year, two year, three years later

16     has to reference and include the original contract number of

17     that initial contract that kind of opened up the floodgates.

18          Now, what we have in this case -- what we found out

19     after the December 19th hearing or a couple of days after that

20     -- is that this is a one time fixed price contract.  It says so

21     for a single event and that is what it says in the contract

22     itself that Mr. Fox showed to us.  He then appended every

23     purchase order that every FBI office has ever made and tried to

24     claim under that.  Even though those subsequent purchase orders,

25     in addition to the original contract saying it was one time,

1    even those subsequent purchase orders don't reference that

2    original contract.  They don't refer to it.  They say it is an

3    open market contract, each of those purchase orders.

4         And I don't say this to belittle Mr. Fox or whomever

5    from the FBI was assisting him, but it doesn't take much

6    familiarity with Government contracts or contract law in general

7    to look at those documents and determine that this is not what

8    the Government has been claiming it was all along.

9         THE COURT:  Do you want to respond to that?

10        MR. FOX:  Yes, Your Honor.  First of all the

11   Government did look at the contract.  The Government felt that

12   the contract was poorly drafted, at best.  We contacted the FBI

13   procurement individuals.  They told us the nature of the

14   contract and we relied upon their assertions.  We also contacted

15   the DCMA Council and they likewise looked at it.  And they also

16   agreed that it was a terribly written contract but apparently

17   that is the purpose that it served.

18        After I met with Mr. Gillen on the 31st of December I

19   contacted the FBI again.  One person continued to assert that it

20   was an umbrella agreement, Mr. Howard.  The next person, Ms.

21   Powell, said this changed her opinion and said that it was a

22   one-time purchase.

23        THE COURT:  When was that?

24        MR. FOX:  That was on the 31st.  At that point we

25   took another look.  We concede that the defense is correct in

1    regards to the characterization of the contract in question.

2        We would also point out that the purchase orders that

3    were seized in the search each contained reference to an MK 141.

4    This is particular nomenclature that is specific to the military

5    by regulation.  It refers to a specific type of item.  In other

6    words, you can't -- it would be akin -- for example if you had

7    anything else with an MK 141 that would be like saying putting a

8    Chevy sticker on a Ford car.  In addition, two of the purchase

9    orders --

10        THE COURT:  Are you saying that just because it's got

11    that label on there that implies this contract.

12        MR. FOX:  It's not implied sir, that is the contract.

13    Because of military nomenclature with the Government.  In

14    addition, Your Honor, two of the purchase orders make specific

15    reference to the national stock numbers.  It would be improper,

16    and the Government would contend unlawful, for a vendor to use a

17    specific military nomenclature as required by regulation and

18    sell it to the Government and present it that this is a certain

19    item and then contend that it is something else.

20        In regards to any discovery issues we would point out

21    that this material has been made available so that the defense

22    could see it at an earlier date, much earlier date.

23        THE COURT:  You are changing your approach to this

24    case two weeks before trial is the way it sounds to me.

25        MR. FOX:  Your Honor, the Court is right.  The

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          Government is changing part of the case.

2                  THE COURT:    It is a very substantial part of the

3          case,  isn't it, based on this fraud proposition which is a

4          central part of your case?

5                  MR. FOX:    It would certainly change the conspiracy to

6          defraud the Government with respect to claims and the

7          substantive claims count.  The Government would respectfully

8          submit that it does not substantially change the conspiracy to

9          defraud the United States under 371.

10                 THE COURT:    Does anybody want to respond to that?

11                 MR. ALMAND:    Judge, I listened to what Harry said and

12         again it is not that I want to dump on Harry, that is not the

13         purpose of my remarks I'm fixing to make.  But, Judge when I

14         read that contract it took me about one minute to figure out the

15         nature of the contract and what it provided.  It does not take a

16         genius, a contract specialist, to be able to understand basic

17         contract law.

18                 Now, the buck stopped with Mr. Fox at the time he

19         drafted this indictment.  I would assume, and the law presumes,

20         that he will be familiar with all aspects of the crime he is

21         charging.  And if you are going to charge that you violate a

22         contract then you are going to study that contract and you are

23         going to understand it.  What we are faced with, in this

24         particular case, is the gross negligence, at best, in the way

25         this indictment was drafted.  Not only as to the contract

1   language but to the other aspects of it also.  Here we are seven

2   days or will be six days before trial when he supposes to return

3   this superseding indictment.  The only necessity for the

4   superseding indictment is not clerical errors or things of the

5   nature that you usually see in a superseding indictment.  What

6   you have is a necessity for a superseding indictment based on

7   gross negligence, and in my view to the lab report, gross

8   misconduct.  Because that document had been in the possession of

9   the FBI, the complaining agency here.  That had been in their

10  possession for four years.  And certainly the FBI knew and are

11  charged with the knowledge of the fact that they had that lab

12  report and that it should have been presented to Mr. Fox.  And

13  the only conclusion I can draw from that is that the conduct of

14  the FBI was deliberate and intentional not to provide that

15  because an agency with the expertise they have -- and I have

16  worked with them for years on both sides of it -- and I have

17  never in my career seen something of this nature where something

18  of so importance that forms the basis for a criminal charge is

19  deliberately withheld.

20          So, I think, all of that needs to be tied together

21  when you start looking at the allegations or the situation

22  involved in either the contract or the withheld laboratory

23  report.

24          MR. GILLEN:   Your Honor, if I could supplement

25  briefly.  It is a very simple sentence.  It is a very simple

1    contract.  It's on the first page of the contract under

2    paragraph two when it says term and type of contract.  The term

3    of this contract shall be for a one-time purchase of items as

4    described in the description list/specification/work statement.

5    The type of contract shall be a firm fixed price type contract.

6    That is pretty simple language.  They knew this.

7         We had discovery, Your Honor, but we could not

8    envision the Government coming up with their theory that there

9    was some overarching contract.  Frankly that's why we wanted to

10   see it.  We thought they had something else as it relates to the

11   grenades and they have now come up or are trying to come up with

12   a new theory, which we think is equally flawed.  Because now we

13   have pointed out the defect in their fraud theory.

14        The problem with the grenade, Your Honor, is even more

15   pronounced than the lab report and more frightening, frankly, to

16   my client and to his company.  And that is this, since we have

17   engaged in discovery we have literally been pleading, screaming,

18   writing, e-mailing the Government for access to the physical

19   remnants of the physical bomb that went off in Pennsylvania.  We

20   have been stonewalled, foot dragging, everything else.  And

21   finally when we are saying, you know, we have got to get access.

22   This Court finally got the Government going and saying, you

23   know, you show them, you go check again.  Your Honor, what this

24   lab report shows us is that yes, there were remnants, because

25   they were tested.  And that's what they looked at and reached

1    the conclusion contrary to the statements of three FBI agents on

2    national television that we are responsible for their injuries.

3    The FBI concluded four years ago that the safety pin was not in

4    place in the grenade.  But also I think there is a reference on

5    the lab report so now we know that those remnants are out there,

6    which they have stonewalled us on to this day.

7         Also, I believe there is a reference in the lab report

8    that it is going to be referred for additional testing.  We

9    don't have that lab report.  And we do not have -- as we sit

10   here today -- a single solitary FBI 302 incident report of the

11   accident.  And in speaking with the Government, you know, and

12   speaking with the case agent -- who I think frankly has been

13   stonewalled by his superiors in Washington -- we say -- we all

14   know, most everybody in this room who is on the defense side was

15   an Assistant United States Attorney for three and a half million

16   years.  We worked with the FBI.  The FBI knows that they write

17   reports, particularly when three of their agents are injured.

18   No reports have been turned over.  No fragments, no exhibits

19   have been turned over.

20        The second lab report has not been turned over.  And

21   yet they have allowed, in our view, in an attempt to prejudice a

22   jury pool, the United States Government -- and I'm not

23   suggesting that it was this United States Attorney's office at

24   all -- but the United States Government and the FBI permitted

25   their three agents to go on CNN and make for a 15-minute show on

1    their allegations against us, knowing that they had a lab report

2    that showed that those allegations are incorrect, and it is

3    disturbing to the extreme.

4        MR. FOX:   If it please the Court, just briefly.  The

5    Government respectfully would show that it would be improper for

6    the Government to go forward and bring forth any evidence

7    concerning the Pennsylvania detonation before a jury in light of

8    the lab report.

9        THE COURT:   As I mentioned earlier that doesn't

10   resolve the problem in my mind.

11       MR. FOX:    Certainly.

12       THE COURT:   I had already restricted or indicated to

13   both sides that I was restricting how that could be used anyway

14   because I thought it was such damaging information and because

15   there was no proof of causation related to it.  And now what we

16   find out is that there is causation proof and it exonerates the

17   Defendants in this case.

18       Let's move on to the mixing of the diversionary

19   charges.  Now, I think, if I understand correctly, that Mr.

20   Karlson and a lawyer and somebody else went up and looked at a

21   batch of these diversionary charges and they weren't mixed.

22       MR. GILLEN:  Your Honor, as to that point.  Actually

23   it was Mr. Lake here from our firm and an employee of PSI, it

24   wasn't Mr. Karlson.  But Mr. McClendon of the FBI accompanied

25   them, as did the investigator, Mr. King, who has been the

1    genesis for these allegations against the company.  He was also

2    present.  We found that odd that he was present.  The important

3    thing here is this is the second phase of the Government's fraud

4    allegation where they allege that in order to deceive the

5    Government what we did is we mixed and matched Lots 73 so that

6    there would be -- so that some of them would be reworked and

7    others wouldn't but that -- and this is the important aspect --

8    but that we marked all of the grenades with the Alpha

9    designation "A" showing that they had been or indicating that

10   they had been reworked.

11        Now, this is an important part of the Government's

12   fraud theory.  Because in their Grand Jury, which was turned

13   over, when Investigator King was asked by the Government about

14   this Lot 73 in his inspection and he testified about mixing and

15   matching.  And he was specifically asked, specifically asked

16   whether or not the items that he had examined -- he examined

17   some 300 of the grenades -- whether or not they had been marked

18   with the Alpha designation indicating that they had been

19   reworked.  He answered, yes, they had all been so marked.  Now,

20   for an Alpha designation, if you look down there, I think that

21   you have to put the Alpha designation or the "A" designation in

22   three different locations, not just one.

23        Well, that was the key or the linchpin for the second

24   phase of the Government's argument on fraud.  Well, when we go

25   up to examine the lot in the presence of the FBI agent and in

1    the presence of the man who swore about this Alpha designation

2    to the Grand Jury, resulting in our indictment, we find that not

3    a single grenade, not one, was marked with the Alpha

4    designation.  And I was stunned to hear this.  On December 31st

5    when I met with Mr. Fox and the agent I raised this issue, and I

6    said, what is your theory now?  How can you say this when your

7    Grand Jury -- in the Grand Jury your theory was that we deceived

8    you and defrauded you by labeling them "A" as having been

9    altered or fixed.  And that we mixed and matched and didn't do

10   it on all of them.  And in my presence the FBI agent

11   acknowledged that -- because he was up there for the examination

12   and confirmed -- none of them were marked with "A", not a one.

13   And so here we have again the fundamental -- this is the second

14   --

15              THE COURT:   Well, let me tell you what my main

16   interest is in this.  I just wanted to make sure that everybody

17   was looking at the same batch.

18              MR. GILLEN:   Yes.

19              THE COURT:   Is there any question about that?

20              MR. GILLEN:   No, no question.

21              MR. FOX:   No.

22              MR. GILLEN:   No question whatsoever about that.  The

23   man who testified about examining that batch was standing with

24   the FBI agent in the presence of our PSI folks and Mr. Lake and

25   they were examining what he had examined and he had testified

1    about.  And his testimony was 100 percent wrong in the Grand

2    Jury about those markings.  There is no doubt about that.

3              THE COURT:   And his name was Mr. Lake?

4              MR. GILLEN:   Mr. Lake, he is right here.  Mr. King.

5              THE COURT:   I'm sorry, who testified before the Grand

6    Jury?

7              MR. GILLEN:   Mr. King, Mike King who was the QAR who

8    has been the driving force for making allegations against the

9    company.

10             THE COURT:   What's your response to that?

11             MR. FOX:   If it please the Court, Your Honor.  I

12   would like to ask Agent McClendon to respond as to how the

13   inspection was conducted and what was determined.

14             THE COURT:   Okay.

15             MR. FOX:   I think that would be appropriate at this

16   point.

17             THE COURT:   Go ahead.

18             MR. MCCLENDON:   Good morning, sir.  Sir, there were

19   two inspections, the first one in '06 when myself and two DCMA

20   Defense Contract Management inspectors went to Quantico and did

21   an inspection of the flash-bangs. They conducted a visual

22   inspection.  And based upon their definition or their conclusion

23   of the inspection they stated that the flash-bangs were salted.

24   I had never heard that term before.  But they indicated that

25   some had been reworked and some had not.

1          THE COURT:   Was Mr. King a part of that?

2          MR. MCCLENDON:  Yes, sir, he was.

3          THE COURT:   Okay.  Go ahead.

4          MR. MCCLENDON:  The second inspection that occurred in

5    December, the latter part of December, Mr. Lindsey used a tool,

6    a device.  I don't know if he got it from PSI or Navy training,

7    but he used a device and tested the spacing between the lever

8    and the lug.  And his conclusion was that none of the items had

9    been reworked.  So there are two items here, the first

10   inspection was a visual inspection and the second inspection was

11   an inspection using a device.

12         THE COURT:   Well, it's my understanding of what I

13   have read here and then again what I heard today, it sounds like

14   there was supposed to be this designation of the "A" or Alpha on

15   there.  Did I misunderstand that?

16         MR. GILLEN:   No, Your Honor, you had it right.

17         THE COURT:   Well, then --

18         MR. FOX:   We respectfully disagree, Your Honor, with

19   the assumption where this is going with the defense.  The issue

20   is that these items were relabeled.  We respectfully contend

21   that it was from lots that were either internally rejected or

22   were rejected by -- in the Lot Acceptance Test process.  That

23   they were relabeled with a Lot 73, a lot that was actually never

24   produced.  And then when the FBI found out about the safety

25   issues a letter was written to Mr. Karlson asking him whether it

1    was true.  He said -- He sent back a letter saying, yes, it is

2    true, I will rework what you have but don't worry, the lots that

3    we sent, the lot that we just sent to the FBI Academy had

4    already been reworked.  And that's alleged in the indictment.

5            THE COURT:   Well, was a part of the -- My

6    recollection about this is that it was determined that there was

7    a defect on one part of this grenade.

8            MR. FOX:   Correct, Your Honor.

9            THE COURT:   The Government came up with the

10    correction that was required and they asked Pyrotechnics to

11    implement that.  Was it a part of this change that this Alpha

12    designation be on the grenades to show that it had been changed?

13            MR. FOX:   If it had been reworked properly there

14    would have been an Alpha designation.  And the letter from Mr.

15    Karlson indicated that the grenades in question had been

16    reworked that had not been.

17            MR. GILLEN:   Your Honor, as it relates to the Alpha

18    designation, the questions were asked specifically of the

19    Government witness King, "Did they have the Alpha designation on

20    them that they had been reworked?"  Answer, "Yes, they did".  So

21    they were all labeled as reworked, but your investigation says

22    only half had been.  The answer -- the witness goes on and says,

23    so, you could obviously tell half the ones we looked at were

24    bent and the other half were full contact with the lug and had

25    not been bent.  Again, a juror said, "But they were all

1    relabeled as modified?"  Answer, "Yes".  And, Your Honor, not a

2    single one -- the Government has not responded in this courtroom

3    today about whether there is one of them up there marked with

4    the Alpha designation because the answer is, not a single one of

5    them is marked with Alpha.

6        THE COURT:  But it sounds to me like their

7    determination that we are hearing about now was based on some

8    kind of microscopic test or some kind of test?

9        MR. RICE:  No, Judge.

10       THE COURT:  I didn't understand.

11       MR. RICE:  What Mr. McClendon referred to is when

12   they rework them they bend the spoon and there is a gauge that

13   is certified by the Navy.  So presumably as the Navy's QAR

14   inspector -- Mr. King is aware of that.  Mr. King testified

15   before the Grand Jury that he went up there, examined, I think,

16   319.  Half of them had been bent, reworked, and half of them

17   weren't and all of them had the Alpha designation.

18       THE COURT:  But I'm trying to understand how it was

19   that on this later time the Government understood that there had

20   been salting, as it was described.  There is some specific type

21   of gauge and you just put that little gauge in?

22       MR. RICE:  It's a little gauge that you slip in there.

23   It takes longer to relabel than it does to bend and measure.

24       THE COURT:  Do I understand --

25       MR. RICE:  Judge, what I infer from this is Mr. King

1    just didn't bother to use a gauge, the Government's gauge.  He

2    just went up and eye balled it and then testified falsely that

3    they had been bent and then testified falsely that they had the

4    Alpha designation.

5         THE COURT:   My question is on the first examination

6    was the gauge used?

7         MR. FOX:   Obviously it was not.

8         THE COURT:   Do you know the answer to that?

9         MR. MCCLENDON:  No, sir.

10        THE COURT:   Okay.  Do we need to talk about that one

11   anymore or can we move on to the next one?

12        MR. GILLEN:  I think the Court understands the factual

13   basis of that aspect.

14        THE COURT:   The next proposition relates to this

15   business about Cundiff and Cheetah Three and the fact that -- I

16   think the original allegation was that this was some kind of

17   payment made to Cundiff by taking him to the Cheetah Three.  And

18   now it appears that although they went to the Cheetah Three, Mr.

19   Karlson had some free tickets to get in or something like that.

20   I mean, it is a little bit confusing to me what the Government's

21   position is.  And I'll have to tell you, I mean, it is unclear

22   to me, based on what you say here about page -- on page three --

23   it's a little bit unclear to me what your response is about that

24   too.

25        MR. FOX:   If it please the Court, Your Honor.  There

1    was, in fact, an incident in which the individuals in question

2    did receive a free pass from Mr. Karlson.  We also anticipate

3    that Mr. Cundiff will enter a guilty plea to supplementation of

4    salaries on Monday, which is a misdemeanor.  It is a violation

5    for a federal employee to receive any compensation in addition

6    to his salary.

7         THE COURT:  So you're saying that Pyrotechnics not

8    only gave him a free pass to Cheetah Three or to whatever it is,

9    but they actually gave him additional money?

10        MR. FOX:  Yes, Your Honor.  Apparently Mr. Cundiff

11   was engaged in the business of selling pool supplies.  He sold

12   pool supplies to Mr. Karlson and received money, which if it is

13   done willfully, it is a felony.  If it is not willfully done it

14   is a misdemeanor on the part of Mr. Cundiff.  At which point

15   shortly thereafter or at some point shortly thereafter, Mr.

16   Cundiff, at the request of Mr. Karlson, contacted the Marines

17   and asked them to take a specific lot, a Lot 77, and indicated

18   that a lower price would be offered by Mr. Karlson for the Lot

19   77.  Mr. Cundiff was not in a position to do that.  It was not

20   proper for him to do that.  He was the tech rep.

21        THE COURT:  Why wasn't it proper for him to do that?

22        MR. FOX:  Because that was way outside his scope,

23   Your Honor.  His job was to make sure that the testing was done

24   correctly.

25        MR. GILLEN:  Your Honor, if I may respond briefly.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    First of all, the Government, in our view, put this in the

2    indictment in order to inflame a jury about whether or not Mr.

3    Karlson or others went to a gentlemen's club, as it is defined

4    in the indictment.  The Government knew, through Mr. Stockinger,

5    that this wasn't passes that Mr. Karlson got.  They were at a

6    Chinese restaurant and the waiter came over and handed all three

7    of them a free pass.  It didn't come through PSI.  Mr. Karlson

8    didn't go and obtain it.  And the Government knew this.  There

9    were zero dollars paid by Mr. Karlson or PSI from Mr. Cundiff or

10   Mr. Stockinger or anybody else.  And they knew this when they

11   put it in the indictment.  Secondly, as it relates to Mr.

12   Cundiff and -- what he was doing is he was selling pool supplies

13   on the side.  And the outrageous allegation is that Mr. Karlson

14   purchased around in the neighborhood of $100, fair market value,

15   of pool supplies from Mr. Cundiff.  That's it.  And as it

16   relates to Lot 77, it is entirely proper, in our view, for Mr.

17   Cundiff to suggest to the Marines or anybody else that they

18   could obtain Lot 77 at a reduced price for training rather than

19   for combat use because there might have been low output on Lot

20   77, I'm not sure.  But that is our point about that aspect of

21   it.

22           THE COURT:   Well, did you, Harry, know that Cundiff

23   got the -- or do you disagree with the statement?

24           MR. FOX:   I do not agree with that, Your Honor.  Mr.

25   Cundiff originally reported the incident to both the FBI and

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    NCIS.

2              THE COURT:    Talking about did he --

3              MR. FOX:    The gentlemen's club.

4              THE COURT:    Right.  That he --

5              MR. FOX:    Mr. Stockinger's statement was something

6    entirely different and I believe he said later.

7              THE COURT:    And what did you last say?

8              MR. FOX:    Mr. Stockinger's statement that Mr. Gillen

9    refers to was a statement that was made later.  That was not the

10   statement made by the Defendant.

11             MR. RICE:    Judge, just so we are clear.  That was a

12   statement made to agents contained in -- memorialized in a

13   report that Mr. Fox had before he returned the original

14   indictment.

15             MR. ALMAND:    And that person is also a Government

16   witness, we anticipate will be a Government witness.  He was

17   interviewed repeatedly by Government agents.

18             Judge, there is another troubling part of this Cundiff

19   situation, and I don't want to step on any other attorney's toes

20   and deals that may be made.  But we have Mr. Cundiff indicted

21   for a felony, a serious crime.  He was a Government employee

22   with a Government pension.

23             Under the way they indicted this case, he was facing

24   substantial time and loss of whatever benefits go when a federal

25   employee gets indicted under those circumstances and convicted,

1    if he is.  Obviously he has decided that it is in his best

2    interest to enter a misdemeanor plea.

3            Now, to me, that whole situation has an odor about it,

4    a distinct odor.  Because as we all know there are times that

5    decisions are made that you have got to bite the bullet rather

6    than avoid the cannon shell.  For that now to be used in some

7    way to suggest that Mr. Karlson or we, as part of this

8    conspiracy, are guilty of that particular conduct I think is

9    reprehensible, because that is what I'm hearing under these

10   circumstances.  Because when you look at Mr. Cundiff's

11   involvement and the facts relating to him, if anyone had a very

12   substantial defense, he does.  And it just has a very distinct

13   odor about it that Mr. Cundiff has made the decision to bite the

14   bullet rather than face the greater risk.  And to now allow that

15   to be used against us in some way has a suggestion that it

16   actually happened, I think is improper.

17           Now, if he wants to do that that is his business.  I

18   don't represent him nor do any of the other ones.  But to take

19   that and use it in some way to suggest that we did it, then I

20   think that is where the problem is, and I thoroughly object to

21   that.

22           THE COURT:  All right.

23           MR. RICE:  And incidentally, Judge, Mike King, the

24   QAR, one of the Government's primary witnesses, he also bought

25   pool supplies from Mr. Cundiff.  And I'm pretty sure that Mr.

1    King has not been charged or indicted with any felony or

2    misdemeanor.

3        MR. FOX:    If I may respond to that last one.    There

4    is nothing improper about one federal employee selling anything

5    to another federal employee as long as they are not in the chain

6    of command with each other.    There is something improper about a

7    federal employee selling and making a profit off of a contractor

8    that he is supposed to be overseeing the contract.

9        THE COURT:    What else do we need to talk about?    I

10   know we need to talk about these experts, the Government's

11   experts.    I tell you, Harry, I don't understand why you waited

12   as late as you did to give these experts.    And when this is over

13   I'm calling Sharon Ratley and telling her that from now on if

14   the prosecution doesn't turn over their expert reports by the

15   pretrial I'm not going to let them testify.    That is going to be

16   the new rule in my court.    I think this is ridiculous to give

17   four experts, two weeks before trial or three weeks, whatever it

18   was.

19        I also don't like the fact that in reviewing your Rule

20   16 responses I can't tell what your experts are going to say.    I

21   don't think these responses satisfy Rule 16 perhaps because

22   there seems to be some indication that there is some report that

23   was actually done by these experts that the Defendants already

24   have.    I don't have a copy of that.    I don't know what that has

25   to say.    But I don't think that what you have provided, what I

1    have seen, is adequate under Rule 16.  I find the delay very

2    troubling in the case.  And I will give you the opportunity to

3    respond to that.

4         MR. GLAZE:   Your Honor, I'm Richard Glaze with the

5    Environmental Protection Agency.  Let me first say that the

6    notification of experts were from me and I will take any

7    responsibility for any problems for it.  But I will say and I

8    responded to the motion in limine of the defense to say that the

9    three experts complained about in that motion have nothing to do

10   or very little to do with the sampling investigation report.

11        The first expert, Richard Ross, is a Government

12   chemist who has -- I stated in one of the notices and

13   supplemented in my response to the motion in limine -- is simply

14   testifying as to the hazardous characteristics of the waste we

15   charged in the substantive counts.  The sampling investigation

16   report is totally unrelated to that testimony.  Although, I will

17   say we intend to ask him if there is any significance with the

18   high magnesium content found in the sampling investigation

19   report that could be related to the burning of the candles.  But

20   that is only after we introduced the report through the

21   Government chemists that were noticed after those first three.

22   So I don't know if I'm being clear.  But the first three we

23   noticed --

24        THE COURT:   Well, whether you are being clear or not

25   you're providing a whole lot more information than what was

1    provided in your Rule 16 report.

2         MR. GLAZE:    Well, Your Honor, and I did attempt to

3    supplement it thoroughly in my response to the motion in limine

4    two days later.    And I apologize to the Court.    I am not as

5    experienced with these matters as perhaps I should be and I

6    should have taken more time to give a fuller explanation.    But I

7    will say on two out of the three witnesses there really wasn't

8    much more to say about what they were going to do.

9         THE COURT:    Well, it's not -- I don't have it in

10   front of me.    But it is not just a matter of what they're going

11   to do.   There is other information that needs to be provided

12   too.

13        MR. GLAZE:    I understand.    I described what we

14   expect them to testify to.    I described their description of

15   their employment and I provided a full resume for each of the

16   witnesses.    And again in the response to the motion in limine I

17   added information for Mr. Ross in detail about what he is

18   relying on to give his opinion.    And frankly, Mr. Ross is giving

19   his opinion on reactivity based on his training and experience

20   primarily, plus information that the Defendant has already

21   related to the munitions.    He is basically studying the

22   characteristics of these munitions, which the Defendant is in a

23   position to know more about than we are.    And applying his

24   chemistry and other expertise to determine whether, in his

25   opinion, they are reactive and ignitable substantives.    So there

1     isn't anything we were hiding.  It is all information that has

2     been available to the Defendants.  In fact, we obtained a lot of

3     it from the Defendants.

4            THE COURT:  Well, I mean, I'm looking at US versus

5     Holland, which was a case decided by the Eleventh Circuit in

6     2007.  It says in this case the Government provided a terse

7     letter which stated only that witness Toby Taylor would testify

8     as to the interstate nexus of the Remington rifle issue followed

9     by an equally terse e-mail stating that Taylor would state that

10    the rifle was manufactured in New York State.  The Government

11    failed to provide any additional information as to the basis and

12    reasons for Taylor's conclusions.  And they found that this was

13    inadequate.  And it sounds very much like what you did in this

14    case in terms of the information that you provided to the

15    Defendants.

16           MR. GLAZE:  I will say I realized when I read their

17    motion that it was too brief.  I supplemented in my response a

18    full paragraph about what he was going to testify and what he

19    would rely on.  And I again apologize to the Court for my

20    mistake but there is no ill will involved in that.

21           THE COURT:  Well, I understand.  This is a very

22    serious case, a very complex case.  That's why we are having all

23    these pretrial conferences because I want to make sure that

24    everything is under control before we get into trial.

25           But, what we've been talking about today are matters

1     that should never even have been a part of the case for the most

2     part, based on what I've heard.  And we are getting this

3     resolved or at least discussed when the trial is supposed to

4     start in about a week.  I find that very troubling.  Do y'all

5     want to respond on the issue of the experts?

6           MR. GILLEN:   Yes, Your Honor.  There were actually --

7     I think they noticed six rather than four experts.  I believe

8     every defense attorney in this room has been notified orally by

9     the Government at one time or another that there would be no

10    Government experts.

11          THE COURT:   Well, you know, I thought -- For some

12    reason I had the impression, after the last conference we had,

13    that there might be one.  I don't know how I got that idea.  But

14    I was very surprised when I today or yesterday, whenever it was

15    that I got all of this, to see that there were numerous experts

16    in the case.  Go ahead.

17          MR. GILLEN:   Your Honor, we have been asking for --

18    you know, for many materials, but specifically on December 19th

19    we were informed by lead counsel for the Government there would

20    be no experts.  That was reconfirmed on December 31st in the

21    meeting in the United States Attorney's office.  Because I was

22    somewhat surprised by that view, that I confirmed that in a

23    letter to Government counsel.  And then suddenly, on the eve of

24    trial, on something as complex as EPA matters, we end up getting

25    a barrage of expert notifications.

1          As to Mr. Ross, we were informed that he would be

2     including opinions, that's it, opinions, not what his opinion

3     is, not the basis of the opinion.  It is, to use the phrase, no

4     way to run a railroad.  And what we have seen -- because we have

5     been, from the defense side, working this case from the first

6     arraignment trying to get this information.  At the last minute

7     the Government now is dumping all of their stuff on us and

8     trying to then hopefully wishing the Court would then permit

9     them to allow them to use this evidence.  Not giving us an

10    opportunity to get prepared for an adequate defense.  It is

11    simply not the way it should be.

12         We have filed a case supporting where the Court

13    should, in our view, exclude the Government's expert witnesses.

14    Whenever the trial is to occur, they should not, in our view, be

15    permitted to use any experts in light of how they have conducted

16    their discovery and their Rule 16 obligations in this case.

17         MR. WITHERS:   If I might be heard on that.  Your

18    Honor, the sampling investigation report that Government's

19    counsel has referenced, was produced on December 19th.  That was

20    part of the production made that day of the earlier pretrial

21    hearing.  That report mentions one fellow, and I believe his

22    name is Simpson who is in EPA.  It does not, however, contain

23    what his opinions are.

24         As it stands now, trial is in 10 days, 11 days.  The

25    disclosures that have been made are inadequate for the defense

1    even to form or formulate a Daubert challenge.  We are

2    completely unable to even get to that point.  And that is why,

3    Your Honor, exclusion is an appropriate remedy.  And that report

4    that the Government has had -- and they indicted this EPA case,

5    I believe, in July, Your Honor.  The report that they disclosed

6    last month, three weeks ago, is dated May 15, 2008.  It is

7    attached as exhibit A to our motion to exclude.

8             THE COURT:   Yes, well, I noticed that it -- I thought

9    it was more than one of these had been around for a long time.

10   But anyway.

11            MR. GLAZE:   Your Honor, may I respond?

12            THE COURT:   Right.

13            MR. GLAZE:   The defense says that my notice merely

14   mentioned that Mr. Ross will give opinions.  But it actually

15   says he will give opinions regarding the hazardous

16   characteristics of the MK 141, the hazardous characteristics of

17   the discarded components of the M583, et cetera.  And that is

18   essentially what his opinions will be.

19            THE COURT:   But I don't think that is enough under

20   Rule 16.  I think we have to know why does he say it is

21   hazardous?  Where does he get that information?  That is the

22   kind of information that I think ought to be in here.  So that

23   as Mr. Withers points out, and accurately so.  How are they

24   going to file a Daubert motion in this case unless they know

25   what the expert has to say and the basis of the opinions and so

1    forth and so on.

2          MR. GLAZE:    You're right.    And that's why I

3    supplemented the notice in my response the next day.

4          THE COURT:    I mean, it certainly seems to me --

5    although I'm not sure that it says this directly or even in the

6    committee notes, but it certainly seems to me that these

7    reports, under Rule 16, ought to be sufficient for the defense

8    to know enough to decide whether there is a 702 issue or not.    I

9    mean, that's logical.    Whether that is required or not I don't

10   know, but it certainly seems to me that it ought to be that way.

11   Anybody else on this issue?

12         MR. GLAZE:    May I address the three chemists that I

13   noticed a second?

14         THE COURT:    Yes.

15         MR. GLAZE:    They are simply going to testify that it

16   is their opinion that the machines they used to subject the

17   waste material to analysis yielded the results that are in the

18   report.    And the basis for their opinion, which I wrote in the

19   notifications, was their training, experience and the machines.

20   I mean, there is no more to it than that unless you dig down

21   real deeply into the scientific side, which we didn't plan to

22   bring up.

23         THE COURT:    Right.    Okay.    What else do we need to

24   deal with?

25         MR. ALMAND:    Judge, I have a major issue.    May I

1    take the podium on this, I've got a bunch of papers?

2          THE COURT:    Yes, go ahead.

3          MR. ALMAND:    I received a letter from Mr. Fox last

4    week addressed to the Court about his plans to return a

5    superseding indictment.  This morning I get a draft of what I

6    presume is what he is going to present to the Grand Jury but I

7    haven't even looked at it yet because I got it first thing this

8    morning.  But Judge, I think I wrote you and told you that I was

9    going to take a look at the law about the use of superseding

10   indictments under these circumstances.  And I have taken a quick

11   look at it.  I think it is clear under the law that a

12   superseding indictment does not cause the dismissal of the prior

13   indictment, it's still standing.  It is still valid unless and

14   until the Court takes some action to deal with it.  So on the

15   moment of the return of a superseding indictment, essentially

16   you have two indictments sitting there.

17         Now, the -- my suggestion and my motion that I wish to

18   make is one is that the Government not be allowed to allow any

19   superseding indictment to interfere with this trial or to be

20   presented to the jury on the theory of this case.  That the

21   Government be required to go forward on the indictment as it

22   originally stands.  And then the Court on that consider the

23   motions to dismiss based upon the information you heard today

24   regarding the safety issues, the explosive issues, the contract

25   issues and those other things.  And that you have to deal with

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    that indictment, not the superseding indictment that is going to

2    be returned, I think, what Tuesday, a week before trial.

3         Now, the law is very clear that a superseding

4    indictment, absent prejudice, that the Defendants can go

5    forward.  But in this case there is going to be prejudice to

6    these Defendants because in essence the Government is changing

7    it's theory of the case and the way they are going to present

8    the case.  We have prepared all along for one series of

9    proposition and one series of proof.  I still don't know what

10   the Government's new theory is going to be in the absence of the

11   contract, but obviously they're going to have to scramble around

12   and come up with something new to try to establish a fraud,

13   since they've lost the contract as the basis for it.  And I'm

14   sure they are very inventive and will come up with something.

15   But be that as it may, that something is new, which means that

16   we have got to then prepare at the last minute to try to meet.

17        THE COURT:   Well, it seems to me that we have a

18   threshold legal issue here about the contract and the

19   implications of the contract.  It may be that that would serve

20   as a basis for a theory to dismiss some component of the

21   indictment.

22        You know, you have outlined, Harry, your idea about

23   the designation of the grenade and that somehow implied the

24   contract back into the sales after 2001.  That strikes me as a

25   legal issue that I'm going to have to decide before we can go

1    forward.  Do you disagree?

2            MR. FOX:    No, Your Honor.

3            THE COURT:    Because if it's not, then you can't go

4    forward on that theory.  I don't think you can present to the

5    jury a factual argument on contract law and ask them to decide

6    it.  I think that is my job.  Do you disagree?

7            MR. FOX:    As to Count 2 I do not disagree, Your

8    Honor.  As to Count 1, Your Honor, not necessarily.

9            THE COURT:    Okay.  Go ahead.

10           MR. ALMAND:    Your Honor, as I sit and think about the

11   position we are in, if everything goes as Mr. Fox plans, then we

12   are going to trial on an indictment that is new to us and that

13   may require substantial preparation at the last minute or it

14   will force us to do something that I'm not going to do and do

15   not want to do would be to ask for a continuance to try to

16   obtain more time to work it out.  And I am definitely not going

17   to do that and I would oppose any effort by the Government, if

18   it comes to that, to make that an issue in this case.  Because

19   what we are faced with, we are here now because literally the

20   Government, through it's own negligence and it's own misconduct,

21   has caused this problem and put us here at the last minute.  And

22   now they want to dig themselves out of a hole by coming up with

23   a new theory and moving forward to our prejudice.  And that's

24   why I think that the only remedy in this case is to leave the

25   pending indictment and then use to do what it takes to that

1    indictment; to either dismiss it, which I think is the only

2    grounds that you have got basically, or to, as you mentioned,

3    not let substantial parts of that go to the jury.  But to allow

4    a new indictment to come in now that cleans up all of the

5    problems, allegedly cleans them up, I think is entirely

6    inappropriate and I think it is entirely to our great prejudice.

7         You know, Judge when I go back, and I did, I got to

8    thinking about this late last night.  On the issues of the

9    firing pin on the grenade detonation and on the contract.  I

10   think you could easily determine from what we now know that

11   someone in the FBI deliberately and intentionally refused to

12   provide that information to Mr. Fox.  Because on an issue as

13   important as this is where their agents are issued, they knew,

14   and anyone in the chain of this investigation knew about the lab

15   report.  But they did not send it down, despite our numerous

16   requests.  I was going back and making requests very early on to

17   Mr. McClendon and asking for it.  And obviously he couldn't get

18   the lab report.  And I appreciate the position he is in because

19   it is his superiors that are not getting it to him.

20        You look at the contract itself, any first year law

21   student can look at the contract and understand the wording of

22   it.  But then to put that as a basis for a crime in an

23   indictment is, to me, unheard of.  And so, all of this just puts

24   us in a very difficult and bad position.  We have been

25   prejudiced.  And you have got questions of the speedy trial act

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1   also coming into play here, which we do not waive if it ever

2   became necessary to do so.  We will not -- I did a little

3   looking at the law on that and I think the law supports our

4   position; that if a continuance was suggested by anyone, that it

5   would result in a violation of the act.  All of that is to say

6   Judge, is that this superseding indictment should not be the one

7   we go to trial on, if he chooses to return it.  And let's deal

8   with the indictment we've got and deal with it the way you've

9   suggested, the way it should be dealt with and still go to trial

10  on the date set.

11          MR. GILLEN:   Your Honor, if I may respond briefly to

12  Hale's remarks.  One of the things that we see and would suggest

13  to the Court, we have made requests for access to dialogue

14  between the Government and the Grand Jury, which returned this

15  indictment, and testimony either of the case agent or others

16  about what representations were made to the Grand Jury about

17  their theory.  And we would suggest that an evidentiary hearing,

18  which would allow us to find out the extent to which the

19  Government -- and when I say the Government I include Quantico,

20  the FBI and Quantico, has willfully failed to provide material

21  which is exculpatory and has given -- whether their testimony

22  has been given to the Grand Jury, which is not only incorrect

23  but willfully incorrect.

24          I would remind the Court that these agents in the

25  Pennsylvania incident testified before this Grand Jury, just

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1      like they did to the nation on CNN.  Mr. King, we now know,

2      looking at his testimony, was absolutely inaccurate on a

3      material element regarding the Alpha designation.  We would

4      suggest that an evidentiary hearing would show and establish the

5      extent of the Government's misconduct in this case would be

6      appropriate.  Because we believe that rather than having a trial

7      we should be having a hearing about whether the indictment

8      should be dismissed with prejudice against the Government for

9      what we have spent a long time establishing, that is, the extent

10     of their -- when I say their, I'm talking largely about what

11     happened in Washington, the FBI and their misconduct.

12          THE COURT:  Well, let me stop you there.  It sounds

13     like you are disagreeing with Hale because you know obviously we

14     can't have a hearing on this next week.

15          MR. GILLEN:  I agree with that.  I do disagree with

16     Hale in one respect.  Your Honor, all my disagreement with Hale

17     focuses on this.  That under Title 18, was it 3161 or 62, when

18     you talk about the speedy trial, if there is a superseding

19     indictment, if the Court allows the Government to go forward on

20     a superseding indictment, and the statue then allows for a 30

21     day window for preparation.  We don't know what their theory is

22     going to be frankly.  They keep changing it.

23          I think that if Mr. Fox comes forward with the theory

24     that he has articulated to the Court, that is going to be

25     subject to yet another motion to dismiss because of the very

1    reason the Court articulated.  That is, the contractual issues.

2    So rather than --

3            THE COURT:   Let me just stop you, okay.  Like Hale, I

4    was thinking about this late last night.  And I will tell you,

5    this case, as far as I'm concerned, is starting to have a bad

6    smell to it.  I will tell you that I have been here seven years.

7    I've tried many criminal cases.  Never once was I concerned

8    about -- we'll call that a euphemism -- about the way the case

9    was put together.  But I am concerned about this case and the

10   way it has been put together.

11           My idea, before I came in here this morning, was to

12   have a hearing about this whole issue about what happened on the

13   failure to provide what you say is Brady material related to the

14   cause of that grenade going off.  Why it is that three FBI

15   agents would get on national television, CNN news, whatever it

16   happened to be, and say what they said when that report was in

17   the file.  I would like to know who did the investigation, the

18   examination and who got a copy of that report.  I would be very

19   interested to know all that information to find out what

20   actually happened in this case.  I would also like to have the

21   opportunity to think about this contract issue.  I think we have

22   this whole issue of the experts and the possibility of some

23   Daubert motion being filed.  It seems to me that I need to

24   consider Hale's argument about the effect of the superseding

25   indictment.  It seems like there are a number of issues here

1  and there may be others.  This is just where we are after an

2  hour and 15 minutes of talking about this case.  I am not happy.

3          MR. FOX:   No, Your Honor, I'm not.

4          THE COURT:   Where do we go from here?  I can try this

5  case starting on May 4th and that ought to be enough time to get

6  these issues resolved, have a hearing on some of these issues

7  and take care of all of this.  I don't see how we can do it

8  between now and Tuesday week.

9          MR. ALMAND:   The Court is aware of other trials that

10  I have that may well interfere with that date.

11          THE COURT:   Well, you say that every time, Hale.  I

12  know that.  I understand that.  So we just have to work with

13  that.

14          MR. ALMAND:   I know.  I have the same three cases

15  that judges keep doing this to me on and it's the same three

16  ones that keep resolving.

17          THE COURT:   One of them is getting ready to get

18  resolved, the Kentucky case is getting ready to get --

19          MR. ALMAND:   Well, I don't know what is going to

20  happen next.  It's depending on what you are going to do today,

21  I guess.  Judge, I very clearly would object to any continuance.

22  And I think that does raise a speedy trial situation for us.

23          If you want to go forward sever us from the case would

24  be my motion at that point.  Mr. Swann's involvement, as Mr. Fox

25  knows, is de minimis in this case.  The evidence against him I

1    could put in a thimble and then it might not be full.

2        THE COURT:    Well, what is the evidence against him?

3    What's your case against him?

4        MR. FOX:    Against Mr. Swann?    Mr. Swann, we have a

5    consensually monitored phone call and we also have several

6    letters that he has written to different agencies regarding the

7    purchase of these items.    We also have a document that was

8    seized and searched where he directed employees of PSI to make

9    sure that a good bang was sent to FLETC as opposed to one that

10   didn't work.

11       MR. ALMAND:    Judge, if this were a civil case and we

12   could present this in the form of a summary judgment you would

13   grant me a verdict.    There is no question.    When you consider

14   what Mr. Fox has said, what really is in evidence and what would

15   come in evidence, it is laughable that it would be sufficient to

16   go beyond a reasonable doubt of criminal intent.    This is

17   nothing new with Mr. Fox.    He and I have debated this a lot.    So

18   we are both familiar with our positions.

19       But, Judge, severance would be the key with regard to

20   Mr. Swann.    And something that I think should be very seriously

21   considered even by the Government.    Harry, if nothing else, you

22   could get rid of me and that would make your day better.

23       THE COURT:    You know, Hale does like to take sick

24   days during trial.    So that is something you have to realize.

25   (Laughter)

1          MR. ALMAND:   Yeah.  I do think there is a speedy

2     trial issue with regard to Mr. Swann on this.  Because we have a

3     trial date set and that trial date was set, you know, and we

4     waived our speedy trial issues for this date.  So the seventy

5     days otherwise has well past.  And there is some law out there

6     regarding when you have a superseding indictment that causes the

7     prejudice to a Defendant that that would not be sufficient to

8     withstand the speedy trial requirements.  So I think that is the

9     only appropriate remedy for him.

10         Because if I am right on the speedy trial act and we

11    go through all of this and then we go to trial and in the very

12    unlikely event we are convicted, then there is a very

13    substantial possibility that the speedy trial act would be found

14    to have been violated.  And someone in a position of Mr. Swann

15    shouldn't have to undergo all of this.

16         THE COURT:   Let me hear from the other defense

17    counsel.

18         MR. GILLEN:   Your Honor, as it relates to the May 4th

19    date, we think that would be appropriate under this

20    circumstance, and this is very important to the company.  As a

21    result of the allegations in the indictment that we now know,

22    based upon what we have discussed this morning, are inaccurate,

23    that the company has been placed on a suspension list.  You

24    know, and these allegations about FBI agents and all this has

25    been related to these folks.  What we would like is for that

1    suspension to be lifted so that -- 90 people out there have

2    already lost their jobs because of the suspension.  The company

3    is trying to maintain its core work group together to work

4    through these issues.  We would like to have the suspension on

5    the company lifted so they could conduct business and then we

6    can handle this case appropriately.  What we don't want to have

7    happen is be the burden or the result of the Government's

8    conduct resulting in the necessity for a continuance, causing

9    the company to either go under or lose even more employees.  So,

10   I think it is something that can be workable and can be done in

11   an appropriate way but we would really need -- and Mr. Karlson

12   is very, very concerned about his employees and trying to keep

13   everybody employed and together.  So that is something that is

14   important to us.

15          We have been defamed in the community, the military

16   community with these allegations by the FBI agents, et cetera,

17   et cetera, which we now know, unfortunately -- well, fortunately

18   for us, but unfortunately we have had this criticism and we

19   would like some intervention in that respect, given the fact

20   that we have seen that the Government has not really -- this has

21   not been their finest hour, to be kind.

22          MR. RICE:   Your Honor, I partially echo Hale's

23   sentiments.  A severance is appropriate.   Mr. Ramon's

24   involvement, particularly in the newly morphed version of what

25   the Government claims PSI did, he is even more tertiary to their

1  claims.  His criminal culpability is almost nil.  If we were to
2  go forward on the current indictment I think a severance would
3  be appropriate.  There is no possible way that I can prepare in
4  less than six days to go forward on the third superseding
5  indictment that Mr. Fox gave us here at 10:00 a.m.
6           You know, I have been trying to think of an analogy of
7  this.  And I don't know if you are a baseball fan?  If you
8  remember the Florida Marlins.
9           THE COURT:   I like football analogies.
10  (Laughter).
11           MR. RICE:   This is Scott Boras and free agency.  The
12  team name is the same but they have eliminated all their
13  players; they have changed their theories; they have changed
14  their facts; they've changed their evidence.  The only thing
15  that is maintained consistent in this is it says, United States
16  of America.  Nothing else is the same in the case.  And what Mr.
17  Fox has done whether this Court -- and I think the right result
18  is a dismissal of the charges against all the Defendants.  And
19  whether this Court wants to couch that under a governmental
20  misconduct theory or under a more benign due process argument.
21  What they have done is they have prejudiced the company.  They
22  have prejudiced the Defendants.  They have, as Mr. Gillen said,
23  they have defamed them.  And now at the last second they have
24  dumped new evidence, new experts and then they have completely
25  changed the theory.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          It is rare you come across a case where something this
2    egregious happens, particularly at this late date.  But what we
3    have here is the textbook example of what they're going to be
4    teaching over at the NAC at new prosecutor's school.  This is
5    how you do not investigate; this is how you do not charge; this
6    is how you do not prosecutor a Federal case.

7          MR. ALMAND:   Your Honor, one additional point as
8    regards to the question of severance of Mr. Swann.  The
9    interesting thing is there is no proof at all that he ever dealt
10   with any FBI contracts.  There is no evidence of that whatsoever
11   in this case.  There is no allegation that he dealt with any of
12   the FBI contracts.  The sole allegations are -- in fact, he
13   didn't -- his job was outside sales for local law enforcement
14   agencies, pure and simple.

15         And, you know, to tie him into all that we have been
16   talking about today, then everything that involves the FBI, you
17   know, I think is highly inappropriate and would certainly stand
18   as a grounds for severance as additional, other than what we've
19   already said.

20         THE COURT:   Anybody else back there want to respond
21   to the issue about a possibility of a May 4th trial?

22         MR. WITHERS:   Judge, I have two comments.  One, as we
23   put in our papers dealing with the motion to exclude the experts
24   and as Mr. Gillen has referenced, the result financially with
25   respect to the very serious charges, which we know now have no

1    factual foundation, it has been to the great financial detriment

2    of the company.   Very serious allegations where FBI agents

3    paraded before the Grand Jury false testimony with respect to

4    that.  And I understand that we may well end up having a hearing

5    on that issue.  But the financial consequences of the

6    Government's conduct are devastating on this company that is

7    currently under indictment.  It has been under indictment for

8    eight months and we thought that we were 11 days from trial.

9    Very, very serious consequences.

10            So I would echo what Mr. Rice says in terms of under

11    the unusual circumstances that are presented here.  This is an

12    appropriate case for dismissal in whatever variety of basis the

13    Court deems appropriate.

14            Secondly, from a personal standpoint, I have -- with

15    respect to the May 3rd trial date or May 4th trial date Your

16    Honor has mentioned.  My understanding from vetting this issue

17    with variety of counsels, this case will take several weeks.

18            THE COURT:   I think the case is getting shorter as we

19    go through.

20            MR. WITHERS:   I would anticipate -- I do want to let

21    Your Honor know that I have a child graduating from the Naval

22    Academy May 22nd that I would not be able to miss.

23            THE COURT:   First time I've gotten that one.  Harry,

24    do you want to respond to all that?

25            MR. FOX:   If it please the Court.  The Government has

1    acted in good faith and has acted on --

2            THE COURT:   I mean, who is the Government, that's

3    what I want to know.   I mean, maybe you have acted in good

4    faith.   I'm not necessarily blaming anything on you about all of

5    this.

6            MR. FOX:   The Government respectfully contends

7    hopefully this time, the third superseding indictment will be a

8    charm.   And we will sure the objections that have been outlined

9    by the defense counsel.

10           The Government would be opposed to any severance on

11   the part of any of the Defendants involved.   Trying this once is

12   enough.

13           THE COURT:   What about the idea of lifting the

14   suspension?

15           MR. FOX:   I'm afraid the Department of Justice has

16   nothing to do with that, Your Honor.   That is up to the

17   Department of Defense.

18           THE COURT:   Right.   I can understand that.

19           MR. GILLEN:   Your Honor, I would suggest that if we

20   have a concurrence from the Department of Justice and propose an

21   order for the Court's consideration, that that would --

22   particularly in light of what we have seen here -- that that

23   might well carry the day.   We simply don't want to have this

24   company financially strangled to death because we can't

25   adequately prepare for a trial in a timely way because of the

1    Government's conduct, not ours.  And so we would like for the

2    Government to work with us in that respect.  I would echo the

3    remarks of Mr. Withers and Mr. Rice regarding the request that

4    there be a dismissal rather than the more innocuous line that

5    the Government proposes.  I think the Court could help us on the

6    suspension issue.

7              THE COURT:   All right.

8              MR. ALMAND:   Judge, just to reiterate a point.  I

9    know I may be beating a dead horse, but I am concerned about the

10   speedy trial issue in this case.

11             THE COURT:   We're just going to have to look at that,

12   Hale.  We'll have to think about that.  I don't think you need

13   to revisit that.

14             MR. ALMAND:   All right.  But regardless of that, if

15   you're going to continue the case, which I thoroughly disagree

16   with, that May 4th date may well present a very real substantial

17   problem for me.  Because every time I get a trial set and you

18   get close to trial in these three cases, something happens and

19   one of them gets continued.  And I'm already about that far from

20   contempt in Kentucky.  Already I have been given an order in

21   Kentucky that if I make another motion for continuance or if I

22   file anything additional in the Sixth Circuit Court of Appeals

23   I'll be held in contempt.

24             THE COURT:   If I take this case off the calendar that

25   helps you out.

1          MR. ALMAND:    Well, yeah, but --

2          THE COURT:    Then you can go up there and try that

3     case.

4          MR. ALMAND:    There is another case that is also

5     scheduled that is going to conflict with this one, that is in

6     Mississippi.

7          THE COURT:    I have been talking to both federal

8     judges over the last year or so about these two cases so I know

9     the situation you are in.

10          MR. RICE:  Judge, one additional point.  If Mr. Ramon

11    and Mr. Swann were severed out -- just so you can evaluate

12    whether or not this should be done.  What Mr. Ramon's job is he

13    is a production manager.  He supervises the ladies who actually

14    put the grenades together on the line.  And as I think you'll

15    recall -- I know we discussed it at an earlier hearing -- No

16    matter what grenades are produced, whether they are ultimately

17    labeled as MKs or MPs, they are all made and manufactured in the

18    exact same manner on the exact same line.  That is what Mr.

19    Ramon does.  If Mr. Ramon and Mr. Swann were to be severed, the

20    length of the trial against those two gentlemen, because the

21    environmental charges generally don't apply to them.  Although

22    Harry has lumped them into the conspiracy for his sake, but I

23    think when he goes back and looks at this there may be a change

24    to that.  The trial against these two gentlemen would probably

25    be a week at most.  At most.  So that is something -- two or

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    three days is probably more likely.  That is something that we

2    could do relatively quickly if the Court were so inclined.

3            THE COURT:   Well, there is one matter we haven't

4    taken up and I remember this from our last hearing on this

5    matter, and that is that I directed the Government to make

6    available various people -- I'm not sure who they were -- for

7    y'all to talk to.  Have y'all had the opportunity to talk to

8    them?

9            MR. FOX:   If it please the Court, Your Honor.  We had

10   an appointment set up through Mr. Lake for the FBI interviews

11   and unfortunately I believe Mr. Lake forgot about it.

12           MR. RICE:   Well, I -- I'm sorry.  Mr. Lake can

13   address that.

14           MR. LAKE:   There was -- I believe Agent McClendon

15   said something about that while I was up in Quantico and my

16   apologies, I did miss that appointment.  I think some other

17   counsel were going to be there too.

18           MR. GILLEN:   As it relates to Teresa Reid who is in

19   Crane, I e-mailed her and informed her that I want to come to

20   Crane personally to interview her.  She e-mailed me back and

21   said that would be fine, you need to work through counsel.  And

22   I e-mailed back with a copy to Mr. Fox saying that counsel

23   needed to confer and confirm with Mr. Fox that it is the order

24   of the Court.

25           I then met with Mr. Fox on this issue on December 31st

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    and informed Mr. Fox that I wanted to have my interview with

2    Teresa Reid in person.  Mr. Fox said that he would prefer that

3    she be in a location in Indiana where he could participate in

4    that interview, which I parenthetically said I don't remember

5    that being a part of the Court's order, but I'm not sure that I

6    could prevent that.  But I asked Mr. Fox to get in touch with

7    Ms. Reid.  I have not heard about that.  I have jumped all over

8    that issue as soon as we left this courtroom to try to get that

9    done.  It has not been done in spite of my e-mails and

10   discussions with the Government in that respect.  I am prepared

11   to go there next week and conduct that interview if that is

12   possible.

13           MR. FOX:   If it please the Court, Your Honor.  I

14   spoke with Ms. Angela Constantino, the counsel for -- one of the

15   counsels at the Naval Warfare Center.  She indicated that her

16   office and Ms. Reid are more than happy to participate without

17   going through the required Tooey regulations.  And they said

18   setting up a meeting should not be any problem.  They also said

19   that a BTC center was available so that if counsel did not wish

20   to travel certainly they would be available, put it that way.

21           THE COURT:   So that doesn't really sound like an

22   issue in the case.

23           MR. FOX:   I don't think it is.

24           THE COURT:   Any other issues we haven't talked about?

25           MR. RICE:  Yes, Judge.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          MR. GILLEN:   Yes.

2          MR. RICE:   The first one, and then I'll let Mr.

3    Gillen address the second one.  One of the things that you

4    ordered at the December 19th conference was I had requested that

5    Harry identify the specifications in the military contract that

6    he alleged these grenades --

7          THE COURT:   Let's take a break.  We have been going

8    for an hour and a half.  Let's take a break and we'll come back

9    and deal with that.

10   (RECESS)

11         THE COURT:   What else do we need to talk about?

12         MR. RICE:   Judge, Mr. Fox and I spoke but I just want

13   to make sure that my understanding of what the Government is now

14   going to do is consistent with what you had ordered.

15         At the last hearing one of the things -- the main

16   allegation is that we sent grenades, sold grenades that failed

17   to meet Government specifications.  One of the things that we

18   have been requesting all along is which specifications in that

19   enormous Navy contract did we fail to meet and which grenades

20   failed to meet which specifications.

21         You had ordered Mr. Fox to provide that information at

22   the last hearing.  So far he has not done it, but what he has

23   just told me during the break is that he will detail for -- Mr.

24   Fox, and please correct me, Harry, if I mischaracterize what you

25   said, is he will provide us, after the hearing, for each grenade

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    shipment order whatever, what specification specifically a

2    shipment failed to meet.  So we will actually, now for the first

3    time, know which deficiencies the Government alleges PSI

4    created.

5              THE COURT:    Anything else that we need to deal with?

6              MR. GILLEN:    Yes, Your Honor.  There is one other

7    matter.  At the December 19th hearing we addressed this issue of

8    the 17C subpoena that we had cause to be served on the counsel

9    or PSI's counsel, in New Jersey regarding the civil matter.  We

10   put Captain Paschal on the phone and we discussed these issues.

11             THE COURT:    I thought we had a resolution to that?

12             MR. GILLEN:    We did until he failed to comply.  What

13   has happened is that I had spoke with the Government and asked

14   them to communicate with the Captain so that he could respond.

15   The Court ordered it to be done either right now or immediately.

16   And when I met with Mr. Fox on December 31st, I told him that I

17   had been calling and e-mailing and that there has been

18   non-compliance.  That I wanted him to speak to the Captain

19   because if he didn't comply then I felt obligated to move the

20   Court for a contempt order.  And he said he would speak with the

21   Captain.  Mr. Fox did provide us on the 31st some documents

22   which he had received from the Captain prior to the hearing on

23   December 19th.  And I said, well that's -- and I start or

24   roughly those are my comments, but we want full compliance.  And

25   no compliance has happened.  I've e-mailed the Captain.  I told

1    him that he is not complying.

2            THE COURT:    Well, we are going to just send out a

3    notice and let the Captain come down here and explain to me why

4    he shouldn't be held in contempt.

5            MR. GILLEN:    Thank you, Your Honor.

6            THE COURT:    Does that take care of that?

7            MR. GILLEN:    Yes, sir, it does.

8            THE COURT:    What else?

9            MR. GILLEN:    That's all that I have, Your Honor.

10           THE COURT:    Harry?

11           MR. FOX:    Nothing from the Government.

12           MR. ALMAND:    Your Honor, there is one other matter.

13   Has the Court made a decision about the question of what the

14   trial date is going to be?

15           THE COURT:    No, I haven't.    Let me just talk about

16   that.    Obviously we have a very unusual situation here regarding

17   this suspension order and business and I can certainly

18   understand why Mr. Karlson and others want to get this case

19   tried.    It obviously puts me in a very difficult situation of

20   trying to deal with these various issues, which seem to be -- go

21   to fundamental aspects of this case.

22           We had the hearing on the 19th of December to resolve

23   all these issues.    And essentially what that lead to was a pot

24   full of other issues that have come up since that time.    And

25   rather than this being a situation where we go over the

1    exhibits, which is my recollection of what the point of this was

2    supposed to be, now we've had basically two hours worth of new

3    complex issues that I am required to deal with, some of which I

4    think are going to require some evidentiary findings, some of

5    which are going to require some serious legal consideration, and

6    I really only have a week to do that.  It seems like to me it

7    can't be done in a week.

8         Now, I have thought of several things, one of them is

9    just to continue the case until May.  But I have got a split of

10   opinion among the defense lawyers about that part of it.  I

11   suppose one thing I can do is exclude the experts and not allow

12   the superseding indictment and travel on with the case as it's

13   already scheduled.  But I don't know what the defense table says

14   about that?  Does anybody have any other ideas other than those

15   two?

16        MR. RICE:  Can we have a moment, Your Honor, just to

17   talk amongst ourselves?

18        THE COURT:  Sure.  Why don't y'all step outside.

19   (RECESS).

20        MR. FOX:  If it please the Court.  After speaking

21   with Mr. Gillen, the Government would move to dismiss the

22   present indictment and would ask that the dismissal be without

23   prejudice.  The Government would like to have additional time to

24   re-evaluate the evidence and to have discussions with the

25   defense counsel about the future of this case and how to

1    proceed, if at all.

2         THE COURT:   Where is Hale?  Oh, there you are.

3         MR. ALMAND:   Your Honor, I spoke to Mr. Swann about

4    this because quite frankly I think that at the present time

5    forcing this case to go to trial would be to our advantage.  But

6    he understands that if we agree to this, then he is giving up

7    some, perhaps, advantage or he may gain some advantage from the

8    standpoint if the Government re-evaluates and comes to its

9    senses they may not bring him back in.  I don't know.  Brad, am

10   I still right, you are still agreeing to this?

11        MR. SWANN:   Yes, sir.

12        THE COURT:   What about the rest of you?

13        MR. GILLEN:   Your Honor, speaking on behalf of Mr.

14   Karlson.  We are agreeable and had recommended to the Government

15   that they dismiss the indictment in light of the many issues

16   that we have discussed with the Court and to reassess it's case

17   and am glad that Mr. Fox and the office believe that is a

18   prudent measure.

19        I did mention to Mr. Fox that in the event that these

20   cases or cases which form the foundation for the indictment, are

21   to be -- ever to be brought again that we wanted it on the

22   record that we were not waiving any of our issues regarding any

23   of the motions regarding the Government conduct of the FBI and

24   Quantico, et cetera, et cetera that we had raised here and I

25   think that is our position.  And I believe also speaking on --

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    Mr. Withers is there, but speaking on behalf of Mr. Karlson, I

2    was also speaking on behalf of PSI, because it's my

3    understanding the dismissal would then -- it would be no basis

4    for the suspension.

5         And I would state on the record that it is our

6    understanding, and I hate to make statements in court based upon

7    third and fourth hand hearsay, but would venture forth

8    nevertheless, that the suspension was advocated by certain

9    individuals within the FBI and Quantico and we certainly hope

10   that that does not happen again.  But I just state that on the

11   record because Mr. Fox and I, I think, are of like mind in terms

12   of having discussions about this matter.  So, yes, we do concur.

13        THE COURT:   All right.  So that is everybody that

14   concurs in dismissing the case?

15        MR. ALMAND:   Your Honor, one point that I would like

16   to make also.  I would make the assumption then that once this

17   is dismissed it is if there were never any criminal charges and

18   we are no longer under any supervision by the probation office

19   or any other restrictions.  We are free until and if they do

20   something else?

21        MR. FOX:   I believe that is part of the -- that's

22   anticipated in the dismissal.

23        THE COURT:   It seems like it would have to be.

24        MR. RICE:   Judge, reluctantly, Mr. Ramon does not

25   object to the dismissal.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          THE COURT:   Okay.  If you reindict the case the first

2     thing we are going to do is have a hearing on these FBI

3     officers.  I'm just telling you because I'm not going to forget

4     about that.  So we're going to get everybody down here that

5     knows anything about it and I'm going to give the lawyers the

6     opportunity to ask questions and I'll probably be asking some

7     questions too.

8          MR. FOX:   Certainly, Your Honor.

9          THE COURT:   And this, by the way, does not let the

10    Captain off the hook.  We are going to send out a notice to him

11    today to show cause why he shouldn't be held in contempt.  Is

12    there any other unfinished business?

13          MR. RICE:   Judge, will we still get those documents?

14          THE COURT:   Well, I don't know whether you'll --

15          MR. RICE:   We'd prefer to receive them.

16          THE COURT:   You are supposed to get the documents.

17    I'm not sure there's any need for you to get the documents if

18    the case is dismissed.  Obviously, if the case is brought back

19    you're going to get the documents because I said you were going

20    to get them and because there was an agreement with the Captain

21    that you were going to get those documents.  So I don't know

22    where that stands.  But at this point I'm not sure that it's

23    really necessary.

24          I think what we need to do -- I think, so there's not

25    going to be any question about this, that we still need to get

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    those documents.  I'm afraid what is going to happen is that

2    maybe he will be reassigned somewhere else or whatever and I

3    want the people that know about this and the people that made

4    the agreement to go ahead and turn over that information.  And

5    so then that will be over and we don't have to worry about that

6    part of it anymore and I don't have to remember what I did six

7    months later.  Do we have an understanding about that?  And you

8    can talk to the Captain and tell him that he's going to be

9    receiving a notice from the Court and he can purge his contempt

10   by providing the information that he told me he was going to

11   provide.

12            MR. FOX:   I will certainly pass that along, Your

13   Honor.

14            THE COURT:   Okay.  Anything else?

15            MR. ALMAND:   No, Your Honor.

16            MR. GILLEN:   No, Your Honor.

17            MR. RICE:   No, Your Honor.

18            THE COURT:   Thank you very much.

19   Hearing adjourned.

20            *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
*TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE*
21   *RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.*

22                           _____

23                           */s TAMMY W. FLETCHER  CCR, USCR*
*UNITED STATES DISTRICT COURT*
24                           *MIDDLE DISTRICT OF GEORGIA*

25                           *DATE:  January 15, 2009*

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*